**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION**

**CIVIL NO.  5:04CV167**

| | |
|---|---|
| **ERIC LAWRENCE CALL,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **Vs.** ) | **MEMORANDUM** |
| ) | **OF OPINION** |
| **MARVIN POLK, Warden, Central** ) | |
| **Prison, Raleigh, North Carolina,** ) | |
| ) | |
| **Respondent.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Petitioner's motion

pursuant to 28 U.S.C. § 2254 and various other motions, to which

responses have been filed.

## I.  STANDARD OF REVIEW

Title 28 U.S.C. § 2254 provides in pertinent part:

(a)  [A] district court shall entertain an application for a writ of
habeas corpus [o]n behalf of a person in custody pursuant to
the judgment of a State court only on the ground that he is in
custody in violation of the Constitution or laws or treaties of the
United States.
. . .
(d)  An application for a writ of habeas corpus on behalf of a
person in custody pursuant to the judgment of a State court

shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;[1] or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[2]

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the

-------------------

[1]A state court adjudication is "contrary" to clearly established federal law only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." **Williams v. Taylor, 529 U.S. 362, 413 (2000).** Moreover, an "unreasonable application" of clearly established federal law is different from an incorrect application thereof. **Id.** Thus, if the state court made an incorrect or erroneous application of correct federal principles, no relief under the habeas statute may be granted as long as the application was not "unreasonable to all reasonable jurists." **Jones v. Stinson, 229 F3d 112, 119 (2d Cir. 2000); Williams, supra.**

[2]"The term 'unreasonable' is no doubt difficult to define. That said, it is a common term in the legal world and, accordingly, federal judges are familiar with its meaning." **Williams, 529 U.S. at 410.** "In an effort to flesh out the way that a reviewing court should approach this question, [the Seventh Circuit] described the term 'unreasonable' as meaning 'something like lying well outside the boundaries of permissible differences of opinion.'" **United States v. Wallace, 458 F.3d 606, 610 (7th Cir. 2006) (quoting Hardaway v. Young, 302 F.3d 757, 762 (7th Cir. 2002)).** "A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable." **Ward v. Sternes, 334 F.3d 696, 704 (7th Cir. 2003) (quoting Hall v. Washington, 106 F.3d 742, 749 (7th Cir. 1997)).**

judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

    (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –

      (A) the claim relies on –

        (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

      (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

        . . .

(i) The ineffectiveness or incompetence of counsel during . . . State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.

**28 U.S.C. § 2254 (footnotes added).** The parties agree that the Petitioner has exhausted all available remedies in state court.

## II. PROCEDURAL HISTORY

On October 9, 1995, the Petitioner was indicted and charged with first-degree murder; the indictment was superseded on March 18, 1996, to add charges of robbery with a dangerous weapon, first-degree kidnaping,

and assault with a deadly weapon with intent to kill. **Volume I,** *attached to* **Respondent's Answer to Petition for a Writ of Habeas Corpus, filed April 11, 2005, at Tab 1, pp. 32-33.** His trial began on July 15, 1996, and on July 19, 1996, the jury found the Petitioner guilty of first degree murder on the basis of premeditation and deliberation and under the felony murder rule. *Id.***, at 104.** The jury also found him guilty of robbery with a dangerous weapon, first degree kidnaping and assault with a deadly weapon with intent to kill inflicting serious injury. *Id.***, at 105.** A separate sentencing hearing was held after which the jury recommended a sentence of death. *Id.***, at 109-116.** The trial court sentenced the Petitioner to death on July 23, 1996. *Id.***, at 117.** The Petitioner moved to by-pass a review of his case by the North Carolina Court of Appeals and on December 31, 1998, the North Carolina Supreme Court affirmed the Petitioner's convictions but vacated his sentence of death and remanded for a new sentencing hearing. *State v. Call***, 349 N.C. 382, 508 S.E.2d 496 (1998).**

On May 17, 1999, the Petitioner's new sentencing hearing began. **Volume II,** *attached to* **Respondent's Answer, at Tab 5, p. 1.** On May 21, 1999, the jury again found that a sentence of death was appropriate. *Id.***, at 54-61.** On that same date, the presiding judge sentenced the

Petitioner to a sentence of death. ***Id.*, at 64-65.** The Petitioner appealed and the North Carolina Supreme Court affirmed his sentence of death on May 4, 2001. ***State v. Call*, 353 N.C. 400, 545 S.E.2d 190 (2001).**

The Petitioner's first motion for appropriate relief was filed on June 25, 2002. **Vol. II, *supra*, at Tab 9.** On June 17, 2003, Senior Resident Superior Court Judge Michael E. Helms denied that motion. **Vol. III, *attached to* Respondent's Answer, at Tab 15.** The Petitioner's petition to the North Carolina Supreme Court for a *writ of certiorari* to review that decision was denied on November 6, 2003. ***State v. Call*, 357 N.C. 579, 589 S.E.2d 130 (2003).**

On March 10, 2004, the Petitioner filed a second motion for appropriate relief based on the Supreme Court's decision of *Crawford v. Washington*, 541 U.S. 36 (2004). **Vol. III, *supra*, at Tab 19.** On May 17, 2004, Judge Helms denied this motion as well. ***Id.*, at Tab 21.** The Petitioner's petition for a *writ of certiorari* for review of that decision was denied by the North Carolina Supreme Court on October 6, 2004. ***State v. Call*, 359 N.C. 71, 604 S.E.2d 916 (2004).** On November 5, 2004, the Petitioner filed his § 2254 petition in this court.

## III. STATEMENT OF FACTS

At around 9:30 p.m., on August 24, 1995, the Petitioner visited Macedonio Hernandez Gervacio (Macedonio) at the mobile home which he shared with his nephew, Gabriel Gervacio. **Call, 349 N.C. at 394, 508 S.E.2d at 503.** Gabriel testified during the trial that the Petitioner, whom he knew from work, came alone that night. **Transcript of Pretrial Motions and Trial Proceedings, Vol. II, at 95-96.** The Petitioner told Macedonio that he would pay him $25 if he helped to move some things. **Call, supra.** Macedonio told his nephew he would "be right back." **Trial Transcript, *supra*, at 97; Call, 353 N.C. at 406, 545 S.E.2d at 195.** Macedonio left with the Petitioner in his truck; however, instead of going to move furniture, the Petitioner drove to a cornfield for the purpose of robbing Macedonio. **Call, 349 N.C. at 394, 508 S.E.2d at 503.** The Petitioner beat Macedonio with a shovel handle and a tire iron, tied his right foot up around his head with a piece of yellow rope and tied his hands behind his back. **Id.**

At approximately 11:00 p.m., Gabriel heard a knock on the door of the mobile home and thinking it was his uncle, he opened the door. **Trial Transcript, *supra*, at 100; Call, 353 N.C. at 406, 545 S.E.2d at 195.** The

Petitioner offered Gabriel $20 to help him move a refrigerator, an offer which Gabriel accepted.  ***Id.*; Trial Transcript, *supra*, at 101.**  As his uncle had done, Gabriel got into the truck with the Petitioner who took him to a cornfield.  ***Call, supra.***  When the Petitioner stopped the truck, he lured Gabriel out of the truck by saying it was stuck.  ***Id.***  As Gabriel began to push the bumper of the pickup, the Petitioner picked up an aluminum bat and after pretending to use it to lift the tire, struck Gabriel on the head.  ***Id.*; Trial Transcript, *supra*, at 101-09.**  Gabriel, however, was able to run away to the edge of a nearby river.  ***Id.*; *Call, supra*.**  Although the Petitioner briefly followed Gabriel, he returned to the pickup and left.  ***Id.***  Gabriel then ran into the cornfield where he hid all night.  ***Id.*; Trial Transcript, *supra*, at 110.**  The next morning, Gabriel was able to swim across the river and began to seek assistance from local residents.  ***Id.***  At the first house he visited, a child came out the door and Gabriel asked if they had a telephone.  ***Id.*, at 111.**  The child answered that they did not, so he went to another house.  ***Id.***  This time a woman answered the door and made a telephone call resulting in the arrival of her son who gave Gabriel a ride back home.  ***Id.*, at 112.**  When a friend of Gabriel's who spoke English arrived at his trailer, the two of them went to the owner of the trailer park,

David Shatley, and the friend translated for Gabriel and told Shatley what had happened. *Id.*, **at 113;** *Call, supra.* Law enforcement officers were called and Gabriel led them to the cornfield where he had been attacked. *Id.* The authorities found the body of Macedonio in the same field. *Id.* Among the evidence found at the scene was Macedonio's baseball cap, his shirt, and a broken stick similar to a shovel handle. *Id.*, **at 407, 545 S.E.2d at 195.**

Gabriel identified the Petitioner as his assailant and the authorities immediately began looking for him. *Id.* He was not found at his residence but he was located in a motel room in Monroe, North Carolina. *Id.* A search of his truck disclosed a bag of clothes and a steel rod which had hair and blood embedded in it. *Id.*

On August 28, 1995, Agent Steve Cabe of the North Carolina State Bureau of Investigation (SBI) interviewed Alan Varden, a friend of the Petitioner. *Id.* Varden also testified during the Petitioner's trial. **Trial Transcript,** *supra*, **at 172.** Varden stated that the Petitioner had discussed robbing Macedonio on numerous occasions and tried to enlist Varden in the plan. *Id.*, **172-74;** *Call, supra.* Varden testified the Petitioner knew that Macedonio was saving money for an automobile and

carried a large amount of cash.  *Id.*  On one occasion, the Petitioner showed Varden a shovel handle which he said he could use to "whack" the victim in the head.  *Id.*; **Trial Transcript, *supra*, at 179.**  On another occasion, the Petitioner showed Varden the cornfield which he explained was desolate and a good place to rob the victim and dispose of his body. ***Id.*, at 180; *Call*, 353 N.C. 407, 545 S.E.2d at 196.**  The Petitioner also offered to share the money with Varden if he would help to "take care" of Gabriel, who was much larger than the Petitioner.  *Id.*  Varden told the SBI that he refused to be a part of this scheme.  *Id.*

Varden also told the agent that at about 8:00 p.m., on the day of the murder, the Petitioner told Varden that he was going to help Shatley move some furniture out of a mobile home.  *Id.*; **Trial Transcript, *supra*, at 183.**  The Petitioner asked Varden if he wanted to help but Varden refused to go. ***Call, supra*.**  Varden did, however, give the Petitioner a length of yellow plastic rope to use to tie down the furniture.  *Id.*

According to Varden, at about 10:30 p.m., the Petitioner returned home where Varden and the Petitioner's wife, Jennie, were playing Nintendo.  ***Call*, at 408, 545 S.E.2d at 196; Trial Transcript, *supra*, at 186.**  The Petitioner asked Varden to help him move a dresser and the two

left, each in their own trucks.  *Id.*  On the way to their destination, they

stopped at a church to use the restroom; and, while there, the Petitioner

handed Varden a one hundred dollar bill stating it was payment for the

camper shell he had gotten from Varden.  *Id.***, at 187-88;** *Call, supra***.**

They next stopped at a gas station where the Petitioner gave Varden a ten

dollar bill and another one hundred dollar bill.  *Id.***; Trial Transcript,** *supra***,**

**at 189.**  When they arrived at Varden's mobile home, the Petitioner

confessed to Varden that he had hit Macedonio over the head with a

shovel handle which had broken and also with a tire iron.  *Id.*  The

Petitioner also described tying up the victim and stated that he needed to

go back to see if Macedonio was still alive and also that he needed to deal

with Gabriel, who had seen him.  *Id.***, at 189-91;** *Call, supra***.**  The

Petitioner asked Varden to go with him, noting that the muffler on Varden's

truck was quieter.  *Id.***; Trial Transcript,** *supra***, at 193.**  Varden refused

but the Petitioner took a baseball bat out of Varden's truck and put it in his

own truck.  *Id.***; at 193-95;** *Call, supra***.**  The Petitioner left and Varden

went back to the Petitioner's mobile home.  *Id.*

About thirty minutes later, Varden testified that the Petitioner came

speeding down the driveway, ran into his home and exclaimed that he had

"fucked up" because although he hit Gabriel with the bat, Gabriel had gotten away. *Id.*; **Trial Transcript,** *supra***, at 195-98.** The Petitioner gathered up his clothes and the three of them went to Varden's trailer where the Petitioner showered and shaved off his mustache. ***Call, supra.*** The Petitioner returned the bat to Varden who wiped it off. ***Id.*; *Call***, 349 N.C. at 395, 508 S.E.2d at 505.** Varden returned to the Petitioner's trailer to get the Petitioner's wallet and pants which he took back to the Petitioner. ***Call***, **353 N.C. at 408, 545 S.E.2d at 196.** The Petitioner wrote a note, subsequently found by authorities, which read: "I Eric Call hereby declare that my wife Virginia Cox Call had absolutely no knowledge of what might have taken place. Signed Eric L. Call." *Id.* Sometime after midnight, the Petitioner left in his truck and subsequently checked into a motel in Monroe, North Carolina, under the name of Richard Finley. ***Call***, **349 N.C. at 395, 508 S.E.2d at 505.**

## IV.  DISCUSSION

The Petitioner has raised a plethora of issues which are addressed *seriatim*.

**A.** **In connection with the Petitioner's post-conviction motions in State court (the "MAR" motions), an evidentiary hearing should have been granted.**

The Petitioner argues that he requested an evidentiary hearing in connection with each of his two MAR's, and that on each occasion his request was denied. A hearing, he claims, would have allowed him to present disputed facts, to examine State officials involved with the decision of whether or not to charge Varden, to examine the same officials concerning "possible *Brady*[3] materials," to obtain sworn testimony from trial counsel, and to obtain sworn testimony from the witnesses.

Motions for appropriate relief in North Carolina are controlled by the statutory provisions of Article 89, N.C. Gen. Stat. §§ 15A-1411, *et seq.* Section15A-1420(c) provides in pertinent part:

> (1) Any party is entitled to a hearing on questions of law or fact arising from the motion and any supporting or opposing information presented unless the court determines that the motion is without merit. The court must determine, on the basis of these materials and the requirements of this subsection, whether an evidentiary hearing is required to resolve questions of fact.
>
> . . .

---

[3]***Brady v. Maryland*, 373 U.S. 83 (1963) (requiring a prosecutor to disclose all evidence favorable to the defendant which is material to the issue of guilt or punishment.)**

(3) The court must determine the motion without an evidentiary hearing when the motion and supporting and opposing information present only questions of law.

. . .

(7) The court must rule upon the motion and enter its order accordingly.  When the motion is based upon an asserted violation of the rights of the defendant under the Constitution or laws or treaties of the United States, the court must make and enter conclusions of law and a statement of the reasons for its determination to the extent required, when taken with other records and transcripts in the case, to indicate whether the defendant has had a full and fair hearing on the merits of the grounds so asserted.

**N.C. Gen. Stat. §15A-1420(c).**

In ruling on the first MAR, and the numerous amendments thereto, the presiding judge noted:

An evidentiary hearing on Call's motion is not required because the claims presented are without merit, are not supported by the law or the evidence of record and can be decided based on the law and the record.

**Vol. III, *attached to* Respondent's Answer, at Tab 15, pp. 43-44.**  The same finding was made by the presiding judge in connection with the second motion for appropriate relief.  ***Id.*, at Tab 21, pp. 11-12.**  That motion was based on an issue of law, *i.e.*, whether *Crawford v. Washington*, 541 U.S. 36 (2004), applied to the Petitioner's case.  ***Id.*, at Tab 19, pp. 1-2 (Counsel claimed in that motion that the "Petitioner was unable to raise this ground before as the opinion overrules prior**

**Supreme Court case law and failure to consider the defendant's claim will result in a fundamental miscarriage of justice.").** As a result, no hearing was warranted in connection with this motion because it was based on an issue of law. **N.C. Gen. Stat. § 15A-1420(c)(3) ("The court must determine the motion without an evidentiary hearing when the motion and supporting and opposing information present only questions of law.").**

> Subsection (c)(7) [of § 15A-1420] mandates that "the court must make and enter conclusions of law and a statement of the reasons for its determination to the extent required, when taken with other records and transcripts in the case, to indicate whether the defendant has had a full and fair hearing on the merits of the grounds so asserted." However, this subsection of the statute must be read *in pari materia* with the other provisions of the same statute. Therefore, when a motion for appropriate relief presents only questions of law, including questions of constitutional law, the trial court *must* determine the motion without an evidentiary hearing. Further, if the trial court can determine from the motion and any supporting or opposing information presented that the motion is without merit, it *may* deny the motion without any hearing either on questions of fact or questions of law, including constitutional questions. Therefore, it does not automatically follow that, because defendant asserted violations of his rights under the Constitution of the United States, he was entitled to present evidence or to a hearing on questions of fact or law. For example, when a motion for appropriate relief presents only a question of constitutional law and it is clear to the trial court that the defendant is not entitled to prevail, "the motion is without merit" within the meaning of subsection (c)(1) and may be dismissed by the trial court without any hearing. Likewise,

where facts are in dispute but the trial court can determine that the defendant is entitled to no relief even upon the facts as asserted by him, the trial court may determine that the motion "is without merit" within the meaning of subsection (c)(1) and deny it without any hearing on questions of law or fact.

**State v. McHone, 348 N.C. 254, 257-58, 499 S.E.2d 761, 762-63 (1998) (internal citations omitted).**

The Petitioner claims that during an evidentiary hearing, he would have examined the State officials involved with the decision of whether to charge Varden. That examination, he claims, would have provided him with *Brady* material. In ruling on the first motion for appropriate relief, the State court judge discussed each such contention by the Petitioner and explained why each was without merit. **Vol. III, *supra*, at Tab 15, pp. 7-11.** In short, Varden's role in the crime was brought out both on direct and cross examination. Moreover, the issue of *Brady* material was raised during pretrial motions, argued and rejected by the trial court. **Trial Transcript, Vol. I, at 37-61.** These rulings were affirmed on appeal. ***Call*, 349 N.C. at 398-401, 508 S.E.2d, at 507-08.** Likewise, evidence about Varden's polygraph examination was excluded based on the motion of the Petitioner's trial counsel. **Trial Transcript, *supra*, at 38.** The Petitioner also claims that if he had been able to examine witnesses and trial counsel

during an evidentiary hearing, exculpatory evidence would have been uncovered.  The State court addressed these claims as well in the decision on the MAR motion.  **Vol. III, *supra*, at Tab 15, p.10 ("Additional evidence is not needed to determine whether, on the plain face of the record, trial counsel were ineffective based on a failure to follow through with the defense goals outlined in opening statement."); *id.*, at p. 11 ("Trial counsel wisely advised Call not to testify, even though it kept his [clean] record from coming before the jury, because cross-examination regarding Call's actions that night of the murder, his change of appearance, change of identity, flight and identification by Gabriel Gonzalez would have been more prejudicial than the benefit gained by presentation of his record."); *id.*, at p. 13 ("Even if Jeremiah Miller were permitted to testify that Varden and Miller's brother Jeff went to Georgia to buy three or four hundred dollars worth of acid after the murder, there is no evidence that the money was provided by Varden rather than Miller's brother Jeff."); *id.*, at pp. 14-15 (The failure of counsel at sentencing to bring out purported mitigating factors of domination by Varden and duress was apparent from the record and could have raised on direct appeal, but was not.  Moreover, the**

**Petitioner denied his guilt throughout trial and sentencing.);** *accord,*
*id.***, at pp. 16-33.**

In the conclusions of law, the State court judge addressed the
contentions of the Petitioner and found that most were either procedurally
barred for failure to have been raised on appeal or because those grounds
had in fact been raised and rejected on direct appeal.  *Id.***, at pp. 33-43.**
Independently of the procedural bars, the judge addressed the substantive
legal issues as well.  *Id.*  In short, the judge determined that even if the
Petitioner's factual disputes were considered, he still was not able to raise
meritorious issues and, therefore, no hearing was required.  *McHone,*
*supra***;** *McHone v. Polk***, 392 F.3d 691, 697 (4**[th]** Cir. 2004),** *cert. denied***,**
**126 S. Ct. 94 (2005).**

The determination by the MAR court that the Petitioner was not
entitled to relief constitutes an adjudication on the merits of those claims.
*Id.*  As a result, this Court's review is limited to whether the State court's
determination "'resulted in a decision that was contrary to, or involved an
unreasonable application of, clearly established Federal law.'"  *Id.* **(quoting**

***Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000)).**  It did not; no hearing

was required and no constitutional error occurred.[4]

The Petitioner also accuses the State court of having abdicated its

role as scribe by having the State submit a proposed order for signature.

The Fourth Circuit has addressed this argument.

> It is true that, with regard to opinions and orders rendered by
> the district courts within this circuit, "[t]he adoption of one
> party's proposed findings and conclusions is a practice with
> which [the Circuit] ha[s] expressed disapproval on a number of
> occasions."  Nonetheless, the disposition of a petitioner's
> constitutional claims in such a manner is unquestionably an
> "adjudication" by the state court.  If that court addresses the
> merits of the petitioner's claim, then § 2254(d) must be applied.

***Young v. Catoe*, 205 F.3d 750, 755 n.2 (4th Cir. 2000) (quoting *Shaw v.***

***Martin*, 733 F.2d 304, 309 n.7 (4th Cir. 1984)); *accord, Bell v. Ozmint*,**

**332 F.3d 229, 233-34 (4th Cir. 2003) ("Although we do not applaud this**

**practice, circuit precedent dictates that it does not provide any basis**

**for applying *de novo* review.").**  In short, simply because a State court

requests one party to draft the proposed findings of fact and conclusions of

law does not mean that the judge never read the proposed decision or

---

[4]A thorough discussion of the issue is contained *infra*.  As has
become the norm in habeas matters, habeas counsel have raised the
same issues under multiple theories.

failed to apply his own legal analysis thereto. In fact, the State court judge placed his signature on the decision. Nor is this Court in a position to impose on state judiciary a proscription from such a practice which has, after all, been in place for well over 50 years.

Moreover, there is another compelling reason to deny any relief on this ground. "The state court held that there was no need for an evidentiary hearing because the issue could be resolved without a hearing and, . . . federal habeas corpus is not an appropriate vehicle to address claims that a state has, in some way, failed to provide an adequate post conviction procedure." **Kandies v. Lee, 252 F.Supp.2d 252, 260 (M.D.N.C. 2003), aff'd, 385 F.3d 457 (4th Cir. 2004), vacated on other grounds, 125 S. Ct. 2974 (2005) (citing Murray v. Giarratano, 492 U.S. 1, 7 (1989)); Sellers v. Ward, 135 F.3d 1333 (10th 1998) (attempt by a habeas petitioner to challenge a state's post conviction procedures fails to state a federal constitutional claim cognizable in federal habeas); Phillips v. Ferguson, 182 F.3d 769, 772-73 (10th Cir. 1999) (challenges to the constitutionality of state post-conviction procedures are not cognizable as independent habeas claims); see**

*also, United States v. Dago*, 441 F.3d 1238, 1248 (10th Cir. 2006) (citing

*Phillips, supra*).


**B.      The MAR Court rendered a decision that was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."**

The Petitioner sets forth numerous incidences of unreasonable

determinations of facts by the first MAR court and two such incidents by

the second MAR court.  Each incident constitutes nothing more than

disagreement with the court's factual determinations.  Factual

determinations of state courts are presumed to be correct.  **28 U.S.C. §**

**2254(e)(1); *Lenz v. Washington*, 444 F.3d 295, 300 (4th Cir.), *cert.***

***denied*, ____ S. Ct. ____, 75 U.S.L.W. 3033 (2006).**  This presumption

applies to both explicit and implicit findings of fact.  ***Campbell v. Vaughn*,**

**209 F.3d 280, 286 (3d Cir. 2000).**  The Petitioner has not rebutted this

presumption by clear and convincing evidence.  ***Id.***  Instead, he offers

nothing more in this section than disagreement.  ***Orman v. Cain*, 228 F.3d**

**616, 619 (5th Cir. 2000) ("It follows from this that mere disagreement**

**with the state court is not enough."); *Weaver v. Bowersox*, 241 F.3d**

**1024, 1030 (8th Cir. 2001) (Even erroneous fact-finding by the state court will not justify granting a writ if that court acted reasonably.).**

**C.     The Petitioner's sentence is unconstitutional due to the withholding of exculpatory material.**

The Petitioner argues that there "was simply no evidence which excluded Varden from being present at the murder scene or striking [Macedonio], other than his own self-serving statements.  Physical evidence that the investigators should have known would have implicated Varden was never sought."  **Petition, at 23.**  In other words, the argument is not that the State failed to turn over exculpatory evidence in its possession, but that the State failed to develop evidence that Varden was the actual murderer instead of the Petitioner.

"To establish a *Brady* claim, a defendant must demonstrate not only *the existence* of evidence favorable to the defendant that was suppressed by the government, but also a 'reasonable probability' that the result of the proceedings would have been different had the evidence been disclosed." *Swisher v. True*, **325 F.3d 225, 233 (4th Cir. 2003) (emphasis added).**  A reasonable probability is one that "undermine[s] confidence in the outcome" of the case.  *United States v. Bagley*, **473 U.S. 667, 682 (1985)**

**(quotations omitted);** *accord, Kyles v. Whitley*, **514 U.S. 419, 434**

**(1995) ("The question is not whether the defendant would more likely**

**than not have received a different verdict with the evidence, but**

**whether in its absence he received a fair trial, understood as a trial**

**resulting in a verdict worthy of confidence.").** *Brady* "'does not place

any burden upon the Government to conduct a defendant's investigation or

assist in the presentation of the defense's case.'" ***East v. Scott*, 55 F.3d**

**996, 1004 (5th Cir. 1995) (quoting** *United States v. Marrero*, **904 F.2d**

**251, 261 (5th Cir. 1990)).** Thus, the Petitioner's argument that the State

should have developed exculpatory evidence on his behalf showing that

Varden was the murderer is incorrect.

Moreover, the Fourth Circuit has also rejected a *Brady* claim in a

case in which the defendant alleged that information provided in an

untimely manner would have allowed him to show that other individuals

were the actual culprits. ***United States v. Walker*, 105 F.3d 650 (table),**

**1997 WL 5772 (4th Cir. 1997).** In *Walker*, the Circuit noted that the

material was turned over to the defendant during trial but he failed to seek

a continuance; thus, there was no *Brady* violation. The Circuit also noted a

case from the District of Columbia Circuit in which the defendant claimed

that the failure to disclose certain documents before trial prevented the development of hypotheses concerning other individuals who might have committed the crime.  *United States v. Henson*, **486 F.2d 1292 (D.C. Cir. 1973).**  In *Henson*, the District of Columbia Circuit concluded that defense counsel's failure to request a continuance, ability to call the other suspects, and ability to argue to the jury in closing that six other persons could have committed the murder with which the defendant was charged indicated that the delayed disclosure did not produce a prejudicial error.  *Id.*, **at 1302 n.10.**  The same reasoning applies here.  Trial counsel effectively cross-examined Varden as to his motives and conduct on the night in question.

Nonetheless, the Petitioner argues that the following evidence was withheld in violation of *Brady*: (1) the fact that the bat had been in Varden's truck; (2) the fact that Varden had yellow rope in his truck; (3) the fact that Varden had previously been at the site where the murder occurred; (4) the fact that the State failed to follow up on whether the tire tracks at the scene matched those of Varden's truck; (5) the fact that Varden was not placed under surveillance to see whether he would spend a lot of money; and (6) the fact that Varden was asked to turn over a pen in his trailer.

"Nondisclosure . . . does not denote that no exculpatory evidence exists, but that the government possesses no exculpatory evidence that would be unavailable to a reasonably diligent defendant." ***Barnes v. Thompson*, 58 F.3d 971, 975 n.4 (4th Cir. 1995); *accord, United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990) ("[T]here is no improper suppression within the meaning of *Brady* where the facts are already known by the defendant.").** "Certainly, then, information that is not merely available to the defendant but is actually known by the defendant would fall outside of the *Brady* rule." ***Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002).** The Petitioner was fully aware of each of the above contentions which he now claims constituted *Brady* violations. He knew that he took the bat from Varden's truck and that Varden provided him with a length of yellow rope. The Petitioner also knew that he had used a pen at Varden's trailer to write the note exonerating his wife.[5] The Petitioner's attorney also knew that the authorities obtained a court order for a handwriting exemplar from the Petitioner. The Petitioner knew that Varden

---

[5]Moreover, as early as January 18, 1996, the Petitioner and his attorney knew about this letter because it was referenced in the affidavit of SBI Agent Cabe attached to the State's motion for handwriting exemplars. **Vol. I, *attached to* Respondent's Answer, at Tab 1, pp. 39-40.**

had previously been at the scene of the crime because he took Varden there.  **United States v. Roane, 378 F.3d 382, 402 (4th Cir. 2004), _cert. denied_, 126 S. Ct. 38 (2005) ("Obviously, Tipton knew who he was with on the evening of the Talley murder – he had no need for the Government to provide him with such information.  Thus, no _Brady_ violation has been shown[.]").**  Likewise, the Petitioner was fully capable of seeking a court order allowing him to compare the tire tracks to those of Varden's truck.  And, he could have sought fees to hire a private investigator to ascertain whether Varden had spent unusually large sums in the days and weeks following the murder.  **_Id._ ("'[W]here the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the _Brady_ doctrine.'" (quoting _United States v. Wilson_, 901 F.2d 378, 381 (4th Cir. 1990))).**

Petitioner's second argument related to Varden is that the State did not disclose that he had "failed" a polygraph.  It is first noted that, in contrast to the position now taken, the Petitioner's attorney moved the trial court to exclude any polygraph evidence.  **Trial Transcript, Vol. I, at 37-38.**  Secondly, the SBI agent administering the test did not proclaim that

Varden had "failed" the polygraph. In fact, he opined that "SA J. L. Jones was unable to reach a conclusive opinion as to the truthfulness of Mr. Varden. Agent Jones and Agent Cabe discussed the high chances of this examination being inconclusive due to statements made by Mr. Varden and his knowledge of the events in this investigation." **Appendix A, SBI Reports of Polygraph Examination,** *attached to* **Petition.** Thus, the characterization that Varden "failed" the polygraph is incorrect.

Counsel also argue that the results of this "failed" polygraph test would have been admissible in the penalty phase of the Petitioner's case. The Petitioner's attorneys cite *United States v. Moussaoui*, 382 F.3d 453 (4th Cir. 2004), for the proposition that polygraph evidence is admissible during the penalty phase of capital cases due to more relaxed evidentiary standards. That case does not deal with such an issue and no such holding is contained within the opinion.

Moreover, in both the State of North Carolina and the Fourth Circuit there is a *per se* ban of polygraph evidence. ***United States v. Prince-Oyibo*, 320 F.3d 494, 497-98 (4th Cir. 2003); *State v. Brewington*, 352 N.C. 489, 505, 532 S.E.2d 496, 506 (2000) ("'[I]n North Carolina, polygraph evidence is no longer admissible in any trial. This is so**

**even though the parties stipulate to its admissibility.'" (quoting *State***

**v. Grier*, 307 N.C. 628, 645, 300 S.E.2d 351, 361 (1983))).**

> Unfortunately for [the Petitioner], his contention on this point is foreclosed by [the Circuit's] decision in *Goins v. Angelone*, 226 F.3d 312 (4th Cir. 2000), *abrogated on other grounds by Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000). In that case, Goins asserted that the prosecutor had committed a *Brady* violation by failing to disclose the results of a polygraph test taken by Barry Scott, who, according to Goins, had committed the murders with which Goins was charged. In disposing of Goins's *Brady* claim, we first concluded that because the record did not reveal which questions Scott had answered untruthfully, there was no basis on which to conclude that the polygraph results were favorable to Goins. We also ruled, however, that Goins could not demonstrate that the polygraph results were "material" because polygraph results were inadmissible for any purpose under Virginia law. As relevant here, Goins asserted that the Constitution mandated the admissibility of polygraph results during the sentencing phase of his capital trial. We disposed of this contention in a footnote: "[a]s the district court noted, . . . '[U]nder current controlling precedent, the Constitution does not mandate admission of polygraph results in capital sentencing proceedings.'"

*United States v. Fulks*, 454 F.3d 410, 434 (4th Cir. 2006) (quoting *Goins,*

*supra*, at 326 n.7 (quoting *Goins v. Angelone*, 52 F.Supp.2d 638, 675

**(E.D. Va. 1999)))) (other internal citations omitted).** This holding, which

reiterates the earlier decision of the *Goins* Court in 2000, clearly refutes the

Petitioner's claim on this issue. ***See, also, Wood v. Bartholomew*, 516**

**U.S. 1 (1995) (no *Brady* violation where the prosecutor did not**

**disclose the fact that a critical witness for the state failed a**

**polygraph).**  Moreover, in North Carolina, "a polygraph does not fall within

the category of 'physical or mental examinations' contemplated under

N.C.G.S. § 15A-903(e)."  ***Brewington*, 352 N.C. at 506, 532 S.E.2d at**

**506.**  Thus, polygraph results were not discoverable.  *Id.*

While the *Goins* and *Fulks* decisions are controlling, there is another

reason to reject this argument.  Trial counsel, Anthony Lynch, who is now

deceased,[6] provided an affidavit in which he averred:

> Had we known that the State had polygraphed Varden, that he
> had not passed the polygraph and that handwriting exemplars
> were taken, our trial preparations would have been significantly
> different and our trial strategy would have been significantly
> more effective.

**Appendix E, Affidavit of Anthony Lynch, *attached to* Petition, ¶ 8.**

However, Mr. Lynch failed to state in what manner trial preparations would

have differed.  ***Gregory v. Polk*, 2006 WL 1877262, \*\*5 (4th Cir. 2006)**

**(citing *United States v. Agurs*, 427 U.S. 97, 113 n.20 (1976)) (allegation**

**that failure to turn over exculpatory evidence prejudiced the petitioner**

––––––––––––––––––

[6]It bears noting for the record that, despite Mr. Lynch's characteristic modesty about his performance in this case on behalf of the Petitioner, he was one of the preeminent criminal defense attorneys in the State of North Carolina.

**by affecting his trial strategy did not make out a *Brady* claim).** "Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review. Nor . . . should such suspicion suffice to impose a duty on counsel to advance a claim for which they have no evidentiary support." ***Strickler v. Greene*, 527 U.S. 263, 286 (1999); *Walton v. Johnson*, 440 F.3d 160, 178 (4th Cir.), *cert. denied*, 126 S. Ct. 2377 (2006).** Mr. Lynch was an entirely ethical attorney, therefore, the fact that he did not pursue allegedly withheld exculpatory evidence shows that the arguments raised now are merely speculation. Moreover, Mr. Lynch acknowledged that the Petitioner "always denied to me that he had murdered Macedonio Hernadez." **Lynch Affidavit, *supra*, ¶ 11.** And, during the trial, the Petitioner's attorney mounted a vigorous cross-examination of Varden which was designed to leave the distinct impression with the jury that Varden was actually the responsible party. **Trial Transcript, Vol. II, at 238 (Q: "Did the fact that the ball bat came from you and . . . a piece of rope came from you cause that to weigh heavily on your mind?" A: "Yes.").**

Next, the Petitioner claims that the State had a *de facto* immunity agreement with Varden which allowed the prosecutor the luxury of not

providing the defense with copies of Varden's statements to the

authorities.[7]  However, trial counsel admits that he had access to those

statements and an opportunity to read them; he was just not allowed to

copy them.  **Lynch Affidavit,** *supra*, **¶ 5.**  Nor does Mr. Lynch claim that

he was prevented from making notes from the statements that he read.  *Id.*

Whether or not Varden had an agreement with the State was exhaustively

explored both by defense counsel and the prosecutor during the trial

testimony.  In what manner the outcome of the trial would have been

different had Mr. Lynch been able to copy the statements, as opposed to

reading them and taking notes, is not explained.

During the cross-examination of Varden, defense counsel elicited the

following exchange:

> Q:     You gave three statements to law enforcement officers, is
>        that correct?
> A:     Correct.
>                              . . .
> Q:     Did you have any discussions with the prosecutor's
>        offfic[e] as to whether you might be prosecuted yourself in
>        this case?
>        (No answer).

---

[7]Although unclear, it may be that this argument is addressed to the alleged withholding of the SBI report concerning the polygraph.  That issue has already been addressed.

Q:     [H]ave you had any discussions with the prosecutor's office as to whether you, yourself, might be prosecuted?

A:     Yes, I have.

Q:     Have you received a grant of immunity from the prosecutors in this case?

A:     No, I have not.

Q:     Have you made any deal with the prosecutors?

A:     No, I have not.

Q:     Well, did they just mention[] you might be prosecuted and didn't say anything more about it?

A:     Yes.

Q:     Did that potential for being prosecuted weigh heavily on your mind?

A:     Yes, it does.

**Trial Transcript, Vol. II, at 212, 237-38.** On re-direct examination, the

prosecutor asked Varden:

Q:     Mr. Varden, you've talked to, to me about the issue of, of immunity, haven't you?

A:     Yes.

Q:     What promises, if any, have you been made by the D.A.'s office?

A:     None, whatsoever.

***Id.*, at 238-39.** "'A *de facto* grant of immunity arises when there is an after-

the-fact determination based on a promise by a person with apparent

authority to make it that the individual will not be prosecuted.'" ***United***

***States v. McKeel*, 2005 WL 165397, \*\*3 (N.M. Ct. Crim. App. 2005),**

***aff'd*, 63 M.J. 81 (U.S. Armed Forces), *petition for cert. filed*, 75**

**U.S.L.W. 3034 (Jul. 13, 2006) (quoting *United States v. Jones*, 52 M.J.**

**60, 65 (C.A.A.F. 1999)).** Here, there was no agreement or promise. Varden clearly testified hoping that he would not be prosecuted, but he did so without the benefit of any agreement.

Moreover, there was nothing more than the Petitioner's innuendo to support the theory that the State had an immunity agreement with Varden. ***Amunga v. Jones*, 51 F. App'x 532, 542 n.9 (6th Cir. 2002) ("Malone could have been charged as an accessory. Amunga essentially equates the prosecutor's failure to bring any charges against Malone with a promise of leniency in exchange fo his testimony. . . . The record in this case does not suggest that Malone had a particular deal when he testified at Amunga's trial.").** The state is under no duty to turn over that which does not exist except upon the speculation of the defendant. ***Medellin v. Dretke*, 371 F.3d 270, 281 (5th Cir. 2004).** The State court found the record established that Varden had no immunity agreement with the State and that the Petitioner had failed to show any evidence to support the existence of a *de facto* agreement. This Court cannot find that this is an unreasonable determination of the facts in light of the evidence.

**E.    The Petitioner received ineffective assistance of counsel at the trial, appellate and re-sentencing levels.**

The Supreme Court has stated the test for determining whether a defendant received adequate assistance of counsel.

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 686 (1984).  Unless a defendant makes both showings, his claim of ineffective assistance of counsel must fail.  *Id.*  Thus, a defendant must show counsel's performance fell below objective standards of reasonableness, and, that but for his conduct, there was a reasonable probability the result of the trial would have been different.  *Id., at 688.*  If the defendant fails to make the first showing, there is no reason to reach the second issue.  *Id.*

The Petitioner's first argument is that defense counsel was ineffective by forecasting certain evidence during the opening statement which he never delivered.  That evidence, he claims, includes the following: (1) that Varden, the Petitioner, and the Petitioner's wife, Jenny, were all friends; (2)

that Varden and the Petitioner's wife had an affair after his arrest which

ended when Varden was physically abusive to her; (3) that there was

violence between Gabriel and his uncle; and (4) that the police gave up

their investigation of Varden prematurely.

Contrary to the Petitioner's claims, the evidence produced during the

trial included the following:

1.  During the direct examination of Varden, it was elicited that Varden and

the Petitioner's wife worked together at Smokey Mountain Barbecue and

became friends.  **Trial Transcript, Vol. II, at 169.**

2.  During Varden's direct examination, it was elicited that the three of

them, Varden, Jenny Call (Jenny) and the Petitioner, spent "quite a bit of

time" together.  ***Id.*, at 170-71.**

3.  During Varden's direct examination, it was elicited that on the evening

of the murder and after the Petitioner fled the area, Varden and the

Petitioner's wife, Jenny, stayed together at Varden's home and

subsequently moved in together, living in an apartment for about five

weeks.  ***Id.*, at 205.**

4.  During Varden's cross-examination, it was elicited that Varden wiped

the bat clean in order to get rid of his own fingerprints, an act which would

also have removed the Petitioner's fingerprints.  *Id., at 225.*  The point was made that by doing so, Varden had made it impossible to trace either his fingerprints or those of the Petitioner.

5.  During his cross-examination, Varden admitted that it had been his idea to use a stun gun on the victim.  *Id., at 230.*

6.  During his cross-examination, Varden admitted that he began living with Jenny on the evening of the murder.  *Id., at 236-37.*  Through a series of questions, defense counsel attempted to show that Varden had been physically abusive to Jenny; however, an objection was lodged as to each question and the trial court sustained each objection.  As a result, although defense counsel tried to elicit this evidence, the trial court would not allow the questions to be answered.  *Id.* **("And, you stayed together until she filed the domestic violence act against you? . . .  [W]ere you a party to a civil lawsuit here in Ashe County in which Virginia Call was the Plaintiff and you were the Defendant [?] . . . Did you assault her and cause nerve damage to her arm?").**

7.  During the cross-examination of Gabriel, defense counsel attempted to elicit that Gabriel and his uncle did not get along and that the victim may have been a violent man who frequently loaned money to a number of

people, any one of whom could have killed him. ***Id.*, at 121-22; 125 ("Your uncle was a very well liked young man[?]"; "Your uncle was not the type of person to spend his money on drugs and alcohol?"; "[F]rom time to time people borrowed money from your uncle?"; "[H]ow many times before in your life would you testify under oath to this jury that you've been taken out into a field and been assaulted by a baseball bat?"); 126 ("So this was an unusual event in your life[?]").**

It was also brought out that despite the severity of Gabriel's injury, he waited all day before reporting the assault to anyone and picked up both his paycheck and that of his uncle the day after the assault, implying that Gabriel himself was the culprit. ***Id.*, at 126-27.** Counsel also attempted to show that on the evening of the murder, Gabriel did not actually see the Petitioner's face. ***Id.*, at 130-31.**

8. In an effort to show that law enforcement stopped their investigation of the case too soon to learn that Varden was involved and/or the actual murderer, trial counsel elicited the following evidence:

(a) Trooper Charles Olive of the North Carolina State Highway Patrol, was cross-examined about the discrepancy in his written report that Gabriel told him the bat was wooden versus Gabriel's direct testimony that

the bat was aluminum.  *Id.*, at 162-63.  Counsel also questioned Trooper

Olive about his written report in which he noted that Gabriel said the

Petitioner asked Gabriel to get out of the truck due to engine trouble, not

because the truck was stuck.  *Id.*, at 164.  This series of questions

attempted to show that the officer did not adequately investigate, thus

resulting in factual discrepancies.  In fact, defense counsel was suggesting

that Trooper Olive recorded statements inconsistent with later testimony,

thus showing that the officer was incompetent, Gabriel could have been

lying, and/or that Varden was the actual murderer.  Counsel also

challenged whether the crime scene had been properly preserved by

Trooper Olive.  *Id.*, at 165.

(b) Deputy Sheriff Steve Houck, who was a captain with the Ashe

County Sheriff's Department, testified that he was with Trooper Olive and

Gabriel on the night that Gabriel led law enforcement to the scene of his

assault.  *Id.*, at 242.  Captain Houck testified that he noticed tire tracks

near the scene, two empty beer cans and a pack of cigarette rolling

papers.[8]  *Id.*, at 246, 252.  Captain Ashe was responsible for the crime

---

[8]Defense counsel objected to the admission of the evidence
concerning beer cans and cigarette papers but the objection was
overruled.  **Trial Transcript, Vol. II, at 253.**

scene on the evening the victim's body was found.  *Id.***, at 256.**  He was the individual who handled the shovel handle and preserved it as evidence for testing at the SBI laboratory for fingerprints, fibers, liquids, and tissue.  *Id.***, at 259-60.**  Trial counsel pointed out that the Petitioner voluntarily provided fingerprints which were not matched with any on the shovel handle.  *Id.***, at 261.**  No tissue or hair was found on the handle; and while a small amount of blood was found, it could not be determined whether it was human blood.  *Id.*  Captain Ashe acknowledged that the victim had abrasions on his face consistent with having been dragged but also admitted that he did not photograph drag marks because he could not find evidence at the scene of  dragging.  *Id.***, at 262.**  And, while admitting that head wounds of the type suffered by the victim typically bleed profusely, he admitted that no testing was done for blood at or around the crime scene, despite the fact that Luminal could have been used to look for blood.  *Id.***, at 263.**  And, trial counsel tried repeatedly to show that the officers failed to investigate Varden: "In your experience, is it important in an investigation to correctly record what material witnesses say about the crime?"  *Id.***, at 265.**  "[D]id Alan Varden give statements to officers who work for you?"  *Id.***, at 266.**  "Do you agree with the statement that before you can solve the case, you

have to have a suspect, and you have to have a certain amount of physical evidence?" *Id.* The prosecutor objected to this line of questioning and his objections were sustained; however, counsel tried to show that Captain Ashe did not conduct an adequate investigation.

(c) SBI Agent Cabe was called to the crime scene for investigation and to take photographs. *Id.*, at 280-81. He testified that he saw two different sets of tire impressions in the sandy soil near the victim's body in an area of the crime scene which had been preserved prior to his arrival by being cordoned off with plastic tape. *Id.*, at 289. He photographed this area and the tire impressions. *Id.*, at 289-90. Agent Cabe also photographed the tires on the Petitioner's vehicle after it was impounded and he testified during the trial to his comparison of the tire impressions from the photographs taken at the scene and those taken of the Petitioner's tires. *Id.*, at 298-99. He testified that the dimensions of the tire impressions were "very close" to being the same. *Id.*, at 301. Agent Cabe also testified that he did not use Luminal at the scene because it could possibly lead to a false reaction when used on soil. *Id.*, at 302-03. And, he did not know if the Petitioner's vehicle was processed for latent fingerprints. *Id.*, at 313-14. Agent Cabe also testified that he took a

statement from Varden.  *Id.*  On cross-examination, trial counsel

established that the tire impressions shown in the two different sets of

photographs actually had a discrepancy of almost two inches.  *Id.*, at 327.

Counsel also pointed out that by using sprays, the SBI could have obtained

an exact impression of the tire tracks at the scene of the crime.  *Id.*, at 328,

330.  In fact, Agent Cabe testified that he had himself used hair spray in

the past; however, nothing was done at this crime scene other than

photographing.  *Id.*, at 329.  As a result, the SBI did not obtain the exact

width and depth of the tire tread and did not get individual characteristics

such as wear or cuts.  *Id.*, at 330.  As for testing for the presence of blood,

counsel noted that "Every day, in courtrooms all across this state, special

agents and lab technicians are testifying about the use of luminal?"  *Id.*, at

332.  Counsel also pointed out that the perpetrator of a crime who might

have stepped in blood at the scene would have carried that blood on his

shoes into his vehicle; however, no testing was done in the Petitioner's

truck.  *Id.*, at 333.  Like Captain Ashe, Agent Cabe did not read the

autopsy report.  *Id.*, at 334-5.  He did not know if the victim had drag marks

on his body.  *Id.*  And, he did not locate any drag marks at the scene.  *Id.*

Counsel also pointed out that there were no paint chips from the truck on

the bat which was found in the Petitioner's truck; no fibers or hair were found in the truck which matched fiber or hair from the victim. ***Id., at 335-39.*** There also were no fingerprints found in the Petitioner's truck which matched the victim. ***Id., at 340.*** Agent Cabe testified that there was rope in the back of the Petitioner's truck which was compared with the rope found on the victim and which did not match. ***Id., at 343.*** This line of questioning was followed with questions showing that Varden had a great deal of knowledge about the crime, indicating that Varden could have been the actual murderer. ***Id., at 344.*** SBI Agent J. S. Taub, whose expertise is the investigation of blood at crime scenes, also testified. During his cross-examination, he admitted that the use of Luminal in the Petitioner's vehicle and at the crime scene could have uncovered additional evidence. ***Id., at 377-81.***

Despite the argument of habeas counsel, trial counsel very adeptly showed that Varden, the Petitioner, and the Petitioner's wife, Jenny, were all friends; that Varden and the Petitioner's wife had an affair after his arrest which ended when Varden was physically abusive to her; that there could have been violence between Gabriel and his uncle; and that the investigating authorities failed to properly investigate the crime scene, the

Petitioner's truck or the possibility that Varden was the real murderer. The fact that the trial court did not admit some of the evidence is no fault of the trial attorneys and thus, cannot support a claim of ineffective assistance.

Moreover, contrary to the argument made by habeas counsel, the record shows that counsel tried valiantly to raise these issues before the jury. The fact remains that the jury did not believe that either Varden or Gabriel was the actual murderer.[9] Based on the clear record of the trial, this Court, therefore, rejects the argument that counsel "abandoned" the theories advanced during opening statements.

Next, habeas counsel claim that no defense was offered for the Petitioner, thus showing that counsel failed to "deliver" the points made during opening argument. Habeas counsel base this claim on the affidavits of trial counsel. While it is true that after the State rested its case, no defense witnesses were called and the Petitioner himself did not testify, that does not constitute abandoning the theories argued to the jury during opening statements. To the contrary, counsel vehemently argued

---

[9] It is not surprising that the jury did not believe that Gabriel was the murderer because that would have required them to believe that he somehow managed to assault himself in the head with a bat.

each defense listed by effective cross-examination of the State's witnesses.

In stark contrast to the strategical decisions made during the trial, counsel thereafter provided affidavits attesting as follows:

> After the State rested in the guilt phase, Eric was upset and anxious. In a way that was out of character for Eric, he urged us strongly to put on a defense. Eric Call felt that if the State's evidence was not contradicted he would be convicted. Tony Lynch and I told Eric that as his lawyers we recommended against putting on evidence. In order to put further pressure on Eric to give up his constitutional right to put on a defense, we had his mother and father brought in to convince him to acquiesce with our plan. We did not put on evidence.

**Appendix F, Affidavit of Don Wiley, *attached to* Petition, ¶¶ 15, 16.**

This averments shows the following: (1) at the end of the State's evidence, the Petitioner was upset and anxious, an emotional state which would be most common for a defendant on trial for his life who has just heard the entire scope of the evidence against him; (2) at this point in the case, the Petitioner urged his attorneys to present a defense, however, this was out of character with his previous instructions; (3) the Petitioner thought that if the State's evidence was not contradicted, he would be convicted; however, this overlooked the cross-examination of the State's witnesses which effectively did contradict key points, ***see e.g., Atwater v. Crosby,***

**451 F.3d 799, 808 (11ᵗʰ Cir. 2006) ("Atwater's counsel subjected the state's case to 'a meaningful adversarial testing,' conducting 'meaningful cross-examination of fifteen of [the state's twenty] witnesses.'" (quoting *Atwater v. State of Florida*, 788 So.2d 223, 231 (2001)))**; (4) the attorneys, not surprisingly, recommended that no defense be presented but that the State be put to the test of proof beyond a reasonable doubt; and (5) the trial attorneys felt so strongly about this strategy, which had previously been agreed upon, that they asked the Petitioner's parents to influence him.

Likewise, Mr. Lynch averred:

In my opening statement before the guilt phase of Eric's trial I promised to produce evidence showing three friends, Eric Call, his wife Gini, and Alan Varden were together the night of the murder, that Allen and Virginia moved in together as soon as Eric was arrested and they would become alibi witnesses for each [other], that Varden assaulted Gini, that Alan Varden had a violent past, that there was a relationship between the decedent and Gabriel that was violent and that Eric Call had a clean record. In spite of this promise of detailed evidence showing the culpability and complicity of Varden and Gini, we put on no evidence in the guilt phase. I realized at the time and still believe that making this promise to the jury and then not following through constituted grievous error. . . . I had no strategic reason for making a promise in the opening before I knew if it would be fulfilled.

**Lynch Affidavit, ¶¶9, 10.**  As noted above, Mr. Lynch most effectively

accomplished each of these goals without ever having to present evidence

during a defense for the Petitioner.  ***United States v. McGill*, 11 F.3d 223,**

**227 (1ˢᵗ Cir. 1993) ("[C]ounsel's handling of the on-again, off-again**

**expert testimony was not only defensible, but impressive."  Counsel**

**succeeded "by dint of skillful cross-examination" in eliciting much of**

**the same evidence as he hoped to establish through his own**

**witness.).**  In typical modest fashion and at a time when Mr. Lynch was

terminally ill, he chose to denigrate his own performance in an effort to

assist his client.  ***Bell v. Cone*, 535 U.S. 685 (2002) (In reviewing an**

**attorney's performance, the distorting effects of hindsight must be**

**eliminated and the performance judged from the perspective of the**

**attorney at the time of trial.); *Lovitt v. True*, 403 F.3d 171, 181 (4ᵗʰ Cir.),**

***cert. denied*, 126 S. Ct. 400 (2005) ("'The best course for a federal**

**habeas court is to credit plausible strategic judgments.'  To do**

**otherwise would be a transparent misuse of the habeas court's power**

**of hindsight." (quoting *Bunch v. Thompson*, 949 F.2d 1354, 1364 (4ᵗʰ**

**Cir. 1991))); *Schmitt v. Kelly*, 2006 WL 1954888, *17 (4ᵗʰ Cir. 2006)**

**("Admittedly, Mr. Cooley testified that, in hindsight, he would have**

**filed a pretrial motion to suppress the Sauer/Schmitt tape at the
penalty phase while simultaneously seeking admission of the tape at
the guilt phase. Even with the acceptance of Mr. Cooley's statement .
. ., that acceptance does not render the trial strategy actually
instituted by Mr. Cooley objectively unreasonable. In hindsight,
almost every lawyer, whether he has won or lost, recognizes that he
could have improved upon some part of his performance at trial, but
that honest recognition does not necessarily mean that his
performance was constitutionally ineffective.").** However, the fact
remains that the promises made in the opening statement were fulfilled.
And, while no evidence was offered about the Petitioner's clean record, Mr.
Lynch planted that seed during the opening statement, an implication
never refuted during the trial. Interestingly, the Petitioner does not argue
that he did not consent to this strategy, nor would his lack of consent
necessarily constitute ineffective assistance of counsel. ***See, e.g., Florida
v. Nixon*, 543 U.S. 175, 187 (2004) (The obligation to consult with a
client "does not require counsel to obtain the defendant's consent to
every tactical decision.").** The claim made here is that the attorneys and
the Petitioner's parents "talked him into" not testifying or presenting

evidence.[10]  However, as the State court found in ruling on the motion for

appropriate relief:

> Trial counsel wisely advised Call not to testify, even though it kept his [clean] record from coming before the jury, because cross-examination regarding Call's actions the night of the murder, his change of appearance, change of identity, flight and identification by Gabriel Gonzalez would have been more prejudicial than the benefit gained by presentation of his record. Trial counsel avoided the risk of putting Call on the stand to testify when he was visibly upset and anxious.  By relying on what had been accomplished through cross-examination of the State's witnesses, trial counsel preserved the right to the last argument. . . .  Call received the benefit of the last argument and the benefit of being able to argue that the State's evidence had proved the points he wanted to make to show reasonable doubt existed.  Trial counsel's decision to forgo defense evidence was a reasonable decision under the circumstances at the time of trial.

**Vol. III, *attached to* Respondent's Answer, at Tab 15, pp. 19-20.**

---

[10]The record shows that counsel discussed this issue with the Petitioner in court at a time when the jury was out of the courtroom.  **Trial Transcript, Vol. III, at 83.**  Thus, there is no issue about the fact that the Petitioner knew he had the right to testify and that it was his right exclusively to exercise.  The claim here is that his attorneys convinced against that course; there is no claim that he was not advised of that right.  And, the Petitioner has never stated what his testimony would have actually been.  **Appendix I, Affidavit of Eric Lawrence Call, *attached to* Petition.**  Thus, he cannot show a reasonable probability that the outcome of the trial would have been different had he testified.  ***Rega v. United States*, 263 F.3d 18, 21 (2d Cir. 2001) (petitioner failed to establish "a reasonable probability that [his] testimony would have led to an acquittal.").**

As noted in *Atwater*, *supra*,

> "the trial record show[ed] that the defendant's first-person profession of innocence, when weighed against the substantial evidence to the contrary presented by the State, would not have changed the jury's verdict."  Considering the overwhelming evidence of Atwater's guilt, the state trial court's finding that Atwater is unable to demonstrate prejudice as required by *Strickland* is neither an unreasonable application of, nor contrary to, federal law.

**Atwater, 451 F.3d at 810-11 (quoting *Strickland, supra*) (internal citations omitted); *Campbell v. Polk*, 447 F.3d 270, 280 (4th Cir. 2006) ("We further cannot fault counsel for heeding petitioner's protestations of his own innocence.  To have pursued a different tack in the face of those assertions would have presented problems of its own.").**

Nor does the Court find persuasive the affidavit of Jenny Call submitted in support of this petition.  This affidavit does nothing more than confirm that the three individuals were together for portions of the evening of the murder.  **Appendix B, Affidavit of Virginia Ann Cox, *attached to* Petition.**  While she claims the Petitioner and Varden "came and went" during the evening, she also notes that sometimes they did so together and other times separately.  ***Id.*, ¶ 12.**  And, when the two came back for

the last time, she acknowledges that the Petitioner told her "there was a problem and that he had to leave." *Id.*, ¶ 14.

Again, the finding of the State court in this regard is neither an unreasonable application of, nor contrary to, federal law. While noting that the Petitioner never deviated from his contention that he "did not do it," the court noted that testimony from his wife would have been damning based on her statement to the authorities. **Vol. III,** *supra***, at Tab 15, pp. 11-12.** The court further noted that her version of the events had changed "significantly," a fact which reduces her credibility. *Id.* Counsel wisely "chose not to present the testimony of certain family members because of their unreliability." ***Bunch***, **949 F.2d at 1364.** "It is becoming all too commonplace to charge even diligent counsel in the midst of difficult circumstances with the adverse outcome in a capital case." *Id.***, at 1363.**

As for the affidavit provided by Jerimiah Miller, the events recounted in that affidavit occurred after the murder. **Appendix D, Affidavit of Jerimiah Alexander Miller,** ***attached to*** **Petition.** It is alleged that Varden and Miller argued over money and drugs; however, that alleged fact has no connection to the claim that Varden was the actual murderer other than mere speculation. Likewise, the allegation that Varden

threatened Miller's brother with the comment "It only took one hit" is based on pure hearsay. Nor is there an affidavit from the brother as to the conduct of Varden toward him, a fact which shows, as the State court noted, that neither Miller nor his brother would have been likely to have testified that they were involved in drug trafficking. **Vol. III,** *supra*, **at Tab 15, p. 13.** And, as noted by the State court, even if Varden were an "angry individual," there was no evidence that he was angry with the victim or Gabriel. *Id.* The finding of the State court is neither an unreasonable application of, nor contrary to, federal law.

The next example of ineffective assistance is the claim of habeas counsel that trial counsel should have requested an accomplice jury instruction. In support of this contention, they claim counsel were ill-prepared during the pre-charge conference. However, the record shows that counsel made articulate arguments in support of a number of motions to dismiss. **Trial Transcript, Vol. III, at 83-90.**

The primary focus, however, is on the failure to request an accomplice instruction, which, the Petitioner contends, would have included the following:

> An accomplice is considered by the law to have an interest in the outcome of the case. You should examine every part of the

testimony of this witness with the greatest care and caution. If, after doing so, you believe his testimony in whole or in part, you should treat what you believe the same as any other believable evidence.

**Petition, at 41 (citation omitted).** The instruction given by the State court was as follows:

> Now, . . . you are the sole judges of the credibility, that is, worthiness of belief of each witness. You must decide for yourselves whether to believe the testimony of any witness. You may believe all or any part or none of what a witness said on the witness stand. In determining whether to believe any witness, you should apply the same tests of truthfulness that you apply in your everyday affairs. These tests include the opportunity of the witness to see, to hear, to know, or remember the facts about which he or she has testified; the manner and appearance of the witness; any interest, bias or prejudice the witness may have; the apparent understanding and fairness of the witness; and whether the testimony is reasonable and whether the testimony is consistent with other believable evidence in this case.

**Trial Transcript, Vol. III, at 205-06.** In each of the above instructions, the jury is told that it is their task to assess the credibility of any witness. In each instruction the jury is told that self-interest or bias may affect a witness' credibility. ***State v. Hood*, 332 N.C. 611, 618, 422 S.E.2d 679, 682 (1992) (There was no error "[b]ecause the trial court's charge afforded the defendant the same benefits a formal charge on [accomplice] would have afforded[.]"); *State v. Vick*, 287 N.C. 37, 213**

**S.E.2d 335 (1975).** The undersigned does not find the distinction between the two instructions is such that there would have been a different result in the jury's verdict had the accomplice instruction been given. ***Hood, supra.*** That is, assuming *arguendo* that counsel should have requested an accomplice instruction and that the State court would have, in fact, given such an instruction, there has been no showing of a "reasonable probability that, but for counsel's unprofessional error[], the result of the proceeding would have been different." ***Strickland*, 466 U.S. at 687-88 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed.").**

Moreover, the Petitioner's defense was that he was innocent and an accomplice instruction would have been contrary to that defense.[11]

---

[11]This Court is compelled to note the "Hobson's choice" faced by criminal defense attorneys who take capital cases. During the trial, they are required to make strategic decisions based on the evidence known at the time and consultations with their clients. Subsequently, however, these attorneys are invariably blamed for any number of wrongs, almost all of which are imagined or invented out of whole cloth. It is most unfortunate that an attorney of the caliber of Mr. Lynch is disparaged when his performance was not only effective but outstanding. In the experience of the undersigned, Mr. Lynch never took a case in which he did not provide excellent representation. It is especially poignant that his reputation is sullied after his demise with speculation as to how he might have better represented this client.

***Campbell***, **447 F.3d at 279 ("[T]rial counsel's strategic decision to**
**argue that Campbell did not commit the murder – instead of pursuing**
**a diminished capacity defense – was objectively reasonable."); *State***
***v. Jordan*, 171 N.C. App. 366, 615 S.E.2d 434 (table), 2005 WL 1581074,**
**\*\*5 (2005) ("As in [*State v. Swann*, 322 N.C. 666, 370 S.E.2d 533**
**(1988)], the jury in the case at bar had ample opportunity to assess**
**the credibility of the witnesses, and had sufficient instructions**
**concerning the witness' potential interest in the outcome, . . . .**
**Accordingly, . . . defendant has failed to demonstrate ineffective**
**assistance of counsel for failure to request an instruction on**
**accomplice testimony.").**  And, as noted previously, trial counsel most
effectively cross-examined Varden as to his personal motives and
involvement.  ***Swann*, 322 N.C. at 688, 370 S.E.2d at 545 (A successful**
**ineffective assistance of counsel claim based on a failure to request a**
**specific jury instruction requires a defendant to prove that without the**
**requested instruction, there was plain error in the jury charge.); *State***
***v. Pratt*, 161 N.C. App. 161, 165, 587 S.E.2d 437, 440 (2003) ("To**
**determine whether it was plain error for trial counsel to fail to request**
**a jury instruction regarding inconsistent statements, this Court may**

**look to whether trial counsel questioned the witnesses about said statements and whether the trial court provided instructions on witness credibility." (citing *Swann*, at 581, 688, 370 S.E.2d at 541, 545)).**

The Petitioner also claims that the failure of counsel to object to certain rulings by the trial court meant that those rulings were not preserved for appellate review.  As a result, he claims ineffective assistance of counsel.  Although habeas counsel list seven rulings to which objection should have been raised, there is no discussion as to why objections should have been lodged.  In addition, some of the items which counsel claims were not addressed on appeal, due to trial counsel's failure to object, were, in fact, considered by the North Carolina Supreme Court. ***Call***, **349 N.C. at 406-07, 508 S.E.2d at 511-12 ("[D]efendant raises several arguments in support of his contention that the trial court erred by allowing Henry Drain to interpret Gabriel's testimony. . . . There was plenary evidence before the trial court from which it could reasonably conclude that Drain was qualified."); *id.*, at 413, 508 S.E.2d at 515-16 ("By this same assignment of error, defendant argues that the prosecution improperly insinuated inadmissible character and**

**hearsay evidence that defendant was fired from his job, that**

**defendant destroyed evidence, and additional inculpatory evidence**

**existed but was not discovered by law enforcement officials. These**

**contentions are also without merit. The record shows that the trial**

**court sustained several of defendant's objections to such evidence. . .**

**. Defendant can show no prejudice where his objections are**

**sustained. The trial court also properly overruled defendant's**

**objection to [other] testimony.");** *id*, **at 414-15, 508 S.E.2d at 516**

**("Prior to trial, defendant filed a motion** *in limine* **to have the trial**

**court review the autopsy photographs** *in camera* **to determine their**

**admissibility. . . . When Dr. Thompson took the stand, defendant**

**renewed his motion, and the trial court heard arguments out of the**

**presence of the jury. . . . The trial court reviewed the photographs**

**and excluded two of them as repetitious, but allowed the prosecution**

**to introduce the other six for illustrative purposes during Dr.**

**Thompson's testimony.").** Petitioner also notes that *appellate* counsel

abandoned two assignments of error concerning closing arguments. While

attributing that abandonment to trial counsel, Petitioner does not explain in

what manner this conduct of appellate counsel should be blamed on trial

counsel.  Moreover, as to the other claims that the prosecutor made improper closing arguments, the North Carolina Supreme Court did, in fact, consider them.  **Id., at 419-20, 508 S.E.2d at 519.**

When a habeas petitioner claims that trial counsel was ineffective without explaining in what manner the performance was lacking, the reviewing court is not obliged to supply the grounds for relief.  "Even in a death penalty case, 'bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond . . . or to require an evidentiary hearing.'"  **Stanford v. Parker, 266 F.3d 442, 460 (6th Cir. 2001) (quoting Zettlemoyer v. Fulcomer, 923 F.2d 284, 301 (3d Cir. 1991)); see also, Washington v. Renico, 455 F.3d 722, 733 (6th Cir. 2006) (quoting Stanford).**  "Such conclusory, speculative allegations do not preclude the district court's dismissal of [the Petitioner's] claim."  **Walton v. Johnson, 440 F.3d at 178; Rolan v. Vaughn, 445 F.3d 671, 682 (3d Cir. 2006) (mere speculation is insufficient); Murphy v. Dretke, 416 F.3d 427, 436-37 (5th Cir. 2005), cert. denied, 126 S. Ct. 1028 (2006) (conclusory allegations fail to establish ineffective assistance); Anderson v. Attorney General of Kansas, 425 F.3d 853, 858-59 (10th Cir. 2005) ("But the factual allegations must be 'specific and**

**particularized, not general or conclusory.'"** (quoting *Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995))).  "[M]ere conclusory allegations do not raise a constitutional issue in a habeas proceeding." *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983).  Thus, these claims are rejected.

As previously noted, the North Carolina Supreme Court affirmed the Petitioner's conviction on direct appeal but vacated his sentence and remanded for a re-sentencing hearing.  At that hearing, the State did not present Varden as a live witness but instead allowed SBI Agent Cabe to read from Varden's statements, which had been admitted during the guilt phase of the trial.  Moreover, Varden, as noted *infra*, testified extensively during the trial and was cross-examined by the Petitioner's attorney. However, the Petitioner claims that allowing Agent Cabe to read from Varden's statement without producing him as a witness at the re-sentencing phase violated his constitutional right to confront the witness. Petitioner claims that the State was obligated to show that Varden was unavailable before he could have been denied an opportunity to cross-

examine Varden during the second sentencing hearing.[12]  This issue was raised and rejected in both of the MAR's.

The Petitioner argues that the case of *State v. Nobles*, 357 N.C. 433, 584 S.E.2d 765 (2003), establishes that the MAR court was wrong.  In *Nobles*, decided on August 22, 2003, the defendant was found guilty of first degree murder.  During the sentencing phase to determine whether he should be sentenced to death or life imprisonment, the State submitted as an aggravating circumstance the fact that the defendant had been convicted of rape in 1988.  Because the victim no longer resided in North Carolina, the State produced her testimony from the 1988 trial through the trial transcript.  The North Carolina Supreme Court found this violated the defendant's rights under the Confrontation Clause because the testimony was provided during a different trial, the witness should have been produced during the sentencing hearing or the State should have explained why she was unavailable and, in the absence of such explanation, the defendant should have been afforded an opportunity to cross-examine her during that hearing.  The decision in *Nobles* is not as compelling as

---

[12] It is worth noting that the Petitioner did not call Varden as a witness himself, no doubt because of the extremely prejudicial content of Varden's trial testimony.

Petitioner claims. The facts are unique in that the State relied on testimony from a different trial than the one for which the defendant was found guilty of a capital offense. And, the North Carolina statute clearly allows testimony from the guilt phase of a capital trial to be used during the penalty phase:

> In the [penalty] proceeding there shall not be any requirement to resubmit evidence presented during the guilt determination phase of the case, unless a new jury is impaneled, *but all such evidence is competent for the jury's consideration in passing on punishment*. Evidence may be presented as to any matter that the court deems relevant to sentence, and may include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (e) and (f) of this section. *Any evidence which the court deems to have probative value may be received*.

**N.C. Gen. Stat. § 15A-2000(a)(3) (emphasis added).**

Likewise, in *State v. Holmes*, 355 N.C. 719, 565 S.E.2d 154 (2002), an investigating officer testified during the capital sentencing phase of the defendant's trial that he had been told by a witness that the defendant had confessed to the murder. The North Carolina Supreme Court held:

> While the Rules of Evidence do not apply to a capital sentencing proceeding, the constitutional right to confront witnesses does apply, *State v. McLaughlin*, 341 N.C. 426, 458 [] (1995) (holding that "[a]lthough the evidence at issue [at sentencing] was admissible as a matter of law under [N.C. Gen. Stat. §15A-2000(a)(3)], we must also address whether the admission of that [evidence] violated defendant's confrontation

rights under the federal and state constitutions"), *cert.denied*, 516 U.S. 1133 [ ] (1996)). The Confrontation Clause of the Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, affords criminal defendants the right to be confronted with the witnesses against him. The principal purpose of confrontation is to secure to the defendant the right to test the evidence of the witnesses against him through cross-examination. Defendant in this case was denied the right to cross-examine the declarant[.] . . . A defendant's mere lack of an opportunity to cross-examine a witness does not necessarily mean, however, that the defendant's confrontation rights were violated: When a court can be confident . . . that the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, the Sixth Amendment's residual "trustworthiness" test allows the admission of the declarant's statements. . . . Assuming *arguendo* that defendant is correct, any error is harmless beyond a reasonable doubt. Defendant was convicted at the guilt-innocence phase of first-degree murder on the basis of premeditation and deliberation and under the felony murder rule. Not having been instructed that it could find defendant guilty of premeditated murder under a theory of acting in concert with [his co-defendant], by this verdict the jury necessarily determined that defendant himself fired the rifle. . . . Though this testimony occurred during the guilt-innocence phase, "all such evidence is competent for the jury's consideration in passing on punishment" as well. N.C.G.S. § 15A-2000(a)(3)(2001).

**Holmes, 355 N.C. at 733-35, 565 S.E.2d 165 (quotations omitted);**

**accord, McLaughlin, 341 N.C. at 458-59, 462 S.E.2d at 18-19**

**("Defendant in this case was not awarded a new trial but was**

**awarded a new capital sentencing proceeding[;] therefore, a new jury**

was impanelled solely to recommend punishment.  Under N.C.G.S. § 15A-2000(a)(3), the State was required to resubmit the evidence presented in the original trial in order to have it considered, but such evidence was competent as a matter of law.  Whether the evidence at issue here was admissible under N.C.G.S. § 8C-1, Rule 804 is not controlling in the case at hand.  Instead, N.C.G.S. §15A-2000(a)(3) expressly provides that evidence presented during the guilt determination phase of a capital case is competent and admissible as a matter of law during a capital sentencing proceeding in the same case. . . .  Although the evidence at issue here was admissible as matter of law under the statute, we must also address whether admission of that recorded prior testimony violated defendant's confrontation rights[.] . . .  [D]efendant was represented by counsel at his original trial and had ample opportunity to cross-examine [the witness] on the stand at that time.  Defendant did in fact extensively cross-examine [the witness] during the original trial.  His motivation to cross-examine [the witness] then was the same as his motivation at the new capital sentencing proceeding[.]").

As noted, *Nobles* was decided on August 22, 2003; however, the Petitioner's first MAR was denied on June 17, 2003 by Judge Helms, prior to the ruling in *Nobles*. **Vol. III,** *attached to* **Respondent's Answer, at Tab 15, p. 45.** Nor did the North Carolina Supreme Court state that the *Nobles* decision was to be applied retroactively.

The Petitioner's second MAR was based solely on the United States Supreme Court decision in *Crawford v. Washington*, *supra*, and that motion was denied by Judge Helms who found that *Crawford* did not apply retroactively.[13] **Vol. III,** *supra***, at Tab 21, p. 13.** Judge Helms' decision was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. *Lave v. Detke*, **444 F.3d 333 (5**th **Cir. 2006) (***Crawford*** does not apply retroactively);** *accord, Espy v. Massac***, 443 F.3d 1362 (11**th **Cir. 2006);** *Murillo v. Frank***, 402 F.3d 786 (7**th **Cir. 2005);** *Dorchy v. Jones***, 398 F.3d 783 (6**th **Cir. 2005);** *Mungo v. Duncan***, 393 F.3d 327 (2d**

---

[13]Assuming *arguendo* that *Crawford* announced a new rule of law, the Petitioner's case became final long before the *Crawford* decision. In North Carolina, a case is final when the judgment of conviction has been rendered, appeal exhausted and the time for a petition for *certiorari* has expired or the petition has been finally decided. ***State v. Zuniga*, 336 N.C. 508, 444 S.E.2d 443 (1994).**

**Cir. 2004),** *cert. denied*, **544 U.S. 1002 (2005);** *Brown v. Uphoff*, **381**

**F.3d 1219, 1227 (10th Cir. 2004),** *cert. denied*, **543 U.S. 1079 (2005);**

*Evans v. Luebbers*, **371 F.3d 438 (8th Cir. 2004),** *cert. denied*, **543 U.S.**

**1067 (2005);** *McGonagle v. United States*, **137 F. App'x 373 (1st Cir.),**

*cert. denied*, **126 S. Ct. 506 (2005).**

Nor does the undersigned find that *Crawford* stands for the

proposition that in a capital sentencing hearing, the defendant must always

have the right to confront witnesses.  In *Apprendi v. New Jersey*, 530 U.S.

466 (2000), a case decided after *Crawford*, the United States Supreme

Court acknowledged the landmark case of *Williams v. New York*, 337 U.S.

241 (1949).

> We should be clear that nothing in [our judicial] history
> suggests that it is impermissible for judges to exercise
> discretion – taking into consideration various factors relating
> both to offense and offender – in imposing a judgment *within
> the range* prescribed by statute.  We have often noted that
> judges in this country have long exercised discretion of this
> nature in imposing sentence *within statutory limits* in the
> individual case.  See, *e.g. Williams,* [at 246-47] ("[B]oth before
> and since the American colonies became a nation, courts in
> this country and in England practiced a policy under which a
> sentencing judge could exercise a wide discretion *in the
> sources and types of evidence used to assist him in
> determining the kind and extent of punishment to be
> imposed*[.]". . .  [E]xplaining that, in contrast to the guilt stage of
> trial, the judge's task in sentencing is to determine, "within fixed

statutory or constitutional limits[,] the type and extent of
punishment after the issue of guilt" has been resolved).

***Apprendi*, *supra*, at 481-82 (emphasis added).** Indeed, the *Williams*

court specifically held that a "rigid adherence to restrictive rules of

evidence properly applicable to the trial[,]" was not warranted during the

sentencing phase of a trial, even when the death penalty is at stake.

***Williams*, 337 U.S. at 247.**

> To deprive sentencing judges of this kind of information would
> undermine modern penological procedural policies that have
> been cautiously adopted throughout the nation after careful
> consideration and experimentation. We must recognize that
> most of the information now relied upon by judges to guide
> them in the intelligent imposition of sentences would be
> unavailable if information were restricted to that given in open
> court by witnesses subject to cross-examination.

***Id.*, at 249-50.** The Petitioner claims that this holding was eradicated by

*Crawford*. *Crawford* was recently addressed by the Seventh Circuit in a

case factually similar to this one, *United States v. Miller*, 450 F.3d 270 (7th

Cir. 2006).

> We now turn to the penalty for Miller's crimes. When imposing
> sentence, the district judge took into account testimony at
> another trial. The informant who led the police to Miller was
> murdered, and Miller's uncle was convicted of that crime. The
> district court considered the transcript of the uncle's testimony
> at that trial. . . . Miller's uncle named him as an accessory in
> the murder. Miller contends that the court's consideration of
> this transcript violates the Constitution, because the uncle was

not subject to cross-examination at his sentencing [citing *Crawford*].  But *Crawford* rests on the confrontation clause of the sixth amendment, *which the Supreme Court has held does not apply to sentencing* [citing *Williams v. New York*, *supra*].  We therefore concluded in *United States v. Roche*, 415 F.3d 614, 618 (7th Cir. 2005), that *Crawford* does not make hearsay inadmissible once guilt has been established.

Nor does the combination of *Crawford* with *United States v. Booker*, 543 U.S. 220 [ ] (2005), change the rules of evidence at sentencing.  The remedial portion of *Booker* deprives the Sentencing Guidelines of their quality as "laws," a step that enables judges to resolve factual disputes as they did before that decision. . . .  Judges should not lean on unreliable hearsay, *but testimony in another trial, subject to cross-examination in open court, is among the most reliable kinds of hearsay.  Miller was free to call his uncle to the stand in his own sentencing if he wanted to pursue this subject, but he chose not to do so*[.]

**Id., at 273-74 (emphasis added).**  Likewise, in *United States v. Luciano*,

414 F.3d 174 (1st Cir. 2005), the witness of an assault flagged down a

police cruiser and told the officer the details of the assault, later going to

the police department and providing a statement.

Two witnesses testified at the sentencing hearing – Officer Thornton and Julissa Torres, Luciano's girlfriend and the alleged victim of the assault.  The teenage witness, Camacho, did not testify.  Officer Thornton testified that fourteen-year-old David Camacho stopped his cruiser on Broad Street in Providence at 9:40 p.m. on July 30, 2003 [and later gave a statement at headquarters].  The defense objected on the basis of hearsay when the officer began describing what the boy had said.  The court overruled the objection, pointing out that hearsay is admissible in a sentencing hearing.

**. . .**

Luciano argues, pursuant to *Crawford*, that his Confrontation Clause rights were violated as a result of his inability to cross-examine the witness, Camacho, at the sentencing hearing. . . . The government offered no evidence showing that Camacho was unavailable as a witness or demonstrating efforts to make him available. . . . Prior to *Crawford*, [the First Circuit] held that the Sixth Amendment right to confront witnesses does not apply at sentencing. . . . By its own terms, *Crawford* does not address whether the Sixth Amendment right to confront witnesses applies at sentencing. *Crawford* concerned "testimonial hearsay" that was introduced *at trial*. In *Crawford*, the Supreme Court held that out-of-court statements by witnesses that are testimonial are barred by the Confrontation Clause, unless witnesses are unavailable and the defendant had a prior opportunity to cross-examine them, regardless of whether such statements are deemed reliable by the court. Nothing in *Crawford* requires us to alter our previous conclusion that there is no Sixth Amendment Confrontation Clause right at sentencing.

*Id*., at 176,178-79 (internal citations and footnote omitted); *accord, United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 1086 (2006) (Arresting officer provided detailed account of the investigation including interviews with witnesses at the sentencing hearing. "Both the Supreme Court [in *Williams*] and this Court, however, have consistently held that the right of confrontation does not apply to the sentencing context and does not

**prohibit the consideration of hearsay testimony in sentencing**

**proceedings.”);** ***Chandler v. Moore***, **240 F.3d 907, 918 (11ᵗʰ Cir. 2001).**

The Petitioner's argument is that when the sentence is death, the

Confrontation Clause does, in fact, apply during sentencing.  However, the

Fourth Circuit has specifically declined to so hold.  In a case where the law

enforcement officer provided testimony during a capital sentencing hearing

as to the statements made by the defendant's co-defendant, the Fourth

Circuit found no reversible error.

> Higgs next challenges the district court's decision to allow
> Captain Robert Rule of the United States Park Police to
> introduce statements made by Haynes in his confession, which
> corroborated the testimony of Gloria and others[.] . . .  During
> the guilt phase, Gloria testified that either Higgs or Haynes
> disposed of the murder weapon[.] . . .  According to Captain
> Rule, Haynes's statements corroborated Gloria's testimony[.]
> . . .
> On appeal, Higgs now argues that the admission of Haynes's
> statements through Captain Rule violated the Confrontation
> Clause of the Sixth Amendment, which he contends does
> remain applicable during the penalty phase of the proceedings.
> . . .  Assuming *arguendo* that the admission of Haynes's
> statements would be a violation of Higgs's rights under the
> Confrontation Clause during the *guilt* phase, such presumed
> error was not plain in the context of Higgs's sentencing phase.
> It is far from clear that the Confrontation Clause applies to a
> capital sentencing proceeding.  In *Bassette v. Thompson*, [915
> F.2d 932 (4ᵗʰ Cir. 1990)], we rejected an argument that the
> admission of a psychiatrist's report during a capital sentencing
> proceeding violated the defendant's confrontation rights, relying
> in part on the Supreme Court's prior holding that the rules of

evidence do not apply in such proceedings.  And, in *Maynard v. Dixon*, 943 F.2d 407, 414 n.5 (4th Cir. 1991), we noted that the question of whether the Confrontation Clause applies in sentencing proceedings remains undecided.  Thus, even if the introduction of Haynes's statements through Captain Rule during the sentencing proceeding was error, we cannot say that the error was plain since it even now remains unclear whether the Confrontation Clause applies in this circumstance.

***United States v. Higgs*, 353 F.3d 281, 323-25 (4th Cir. 2003); *accord,***

***Szabo v. Walls*, 313 F.3d 392, 398 (7th Cir. 2002) (The habeas petitioner**

**contended "that under the Confrontation Clause the transcripts of**

**five witnesses' testimony at the first sentencing could be used only if**

**they were unavailable at the time of the second sentencing hearing –**

**and that the record does not demonstrate unavailability.  Yet the**

**Supreme Court has held that the Confrontation Clause does not apply**

**to capital sentencing.  It applies through the finding of guilt, but not to**

**sentencing, <u>even when that sentence is the death penalty.</u>". . .  [T]he**

**law of capital sentencing has changed considerably.  <u>Nonetheless,</u>**

**<u>the Supreme Court of the United States has never questioned the</u>**

**<u>precise holding of *Williams v. New York*, and we are not entitled to do</u>**

**<u>so in this collateral attack.</u>" (emphasis added)).**  As a result, this Court

cannot find that the State court reviewing the MAR's rendered a decision

that was contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  Nor was that decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

As would be expected, Petitioner also argues that trial counsel were ineffective when, at the re-sentencing hearing, they allowed Agent Cabe to read from Varden's statements instead of requiring his live testimony so that they could cross-examine him in front of the jury.  As noted *infra*, Varden was a damning witness with whom trial counsel dealt exceptionally well on cross-examination.  ***McGill*, 11 F.3d at 227 ("[C]ounsel's handling of the on-again, off-again expert testimony was not only defensible, but impressive."  Counsel succeeded "by dint of skillful cross-examination" in eliciting much of the same evidence as he hoped to establish through his own witness.).**  Had trial counsel subpoenaed Varden for the second sentencing hearing, there is no doubt but that the Petitioner would now claim that allowing him to testify was ineffective assistance due to the highly prejudicial nature of Varden's testimony.  Moreover, Mr. Lynch argued the precise issue now phrased by habeas counsel: in connection with the evidence presented by the State to

support the aggravating factors, only hearsay evidence was presented.

**Trial Transcript, Vol. III, at 172-73.**  Although he acknowledged that the

North Carolina statute allowed hearsay evidence in a capital sentencing

hearing, Mr. Lynch nonetheless argued that such evidence violated the

Petitioner's constitutional right to confront his witnesses.  *Id.*  Indeed, Mr.

Lynch preserved the very issue now argued.  For all the reasons previously

stated, the Court declines to find that counsel were ineffective in failing to

insist on Varden's actual presence at the re-sentencing hearing.  Likewise,

the State court's decision in that regard is unassailable on habeas review.

The Petitioner also attacks appellate counsel for failing to make this

confrontation clause argument on direct appeal after his re-sentencing.[14]

For all the reasons stated above, the undersigned cannot find ineffective

assistance of counsel.  Likewise, the State court ruling on the MAR also

found that appellate counsel were effective.  This Court cannot find that the

State court reviewing the MAR rendered a decision that was contrary to, or

involved an unreasonable application of, clearly established federal law as

---

[14] Habeas counsel argue that Mr. Lynch was ineffective in raising the confrontational clause issue "too late" at the re-sentencing hearing. Despite having been cast in the role of an incompetent, Mr. Lynch in fact preserved the issue for appeal.  Because he did so, habeas counsel were able to raise the issue of ineffective assistance of appellate counsel.

determined by the Supreme Court. Nor was that decision based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

In a second attack on the performance of appellate counsel, the Petitioner claims that because counsel was from out of state, he was unfamiliar with North Carolina appellate practice. The Petitioner's attorney on direct appeal was Barry Fisher who is a member of the New York and North Carolina bars. **Appendix O, Affidavit of Barry Fisher, *attached to, Petition.*** Mr. Fisher was successful in having the Petitioner's death penalty vacated and his case remanded for a new sentencing hearing. Despite this outstanding performance, Mr. Fisher claims that many of the issues he raised on appeal were rejected by the North Carolina Supreme Court because he failed to allege that the trial court had committed plain error and/or failed to make direct argument of the manner in which the error was plain. He also neglected to attach portions of the trial transcript in support of certain issues raised on appeal. Based on this admission, Petitioner now claims that a litany of issues were not addressed which, had they been, would have resulted in a new trial.

First, Petitioner argues that the trial interpreter, Henry Drain, paraphrased the answers of Gabriel during his trial testimony instead of providing a literal interpretation thereof.  He also claims the interpreter should have been disqualified because Drain was an employee of local law enforcement, that is, he acted as an interpreter for local law enforcement.  However, the North Carolina Supreme Court expressly considered, and rejected, both of these issues on direct appeal.  **Call, 349 N.C. at 406, 508 S.E.2d at 511-12 ("First, defendant contends that Drain was not qualified [as an interpreter], was biased because he had worked as an interpreter for local law enforcement, and did not accurately interpret Gabriel's testimony. . . .  [T]he trial court did not abuse its discretion [in the use of Drain as an interpreter].").**

Without any citation to the record, Petitioner claims that Drain acted as an interpreter for Gabriel during questioning by the police and again during the trial.  Thus, he argues the interpreter had a personal stake in assuring that Gabriel's trial testimony matched his written statement.  The Petitioner has not made any citation to any portion of the record showing that this was, in fact, the case.  Moreover, it is quite possible that these arguments were presented to the North Carolina Supreme Court on direct

appeal; however, Petitioner has not shown that they either were or were not. As noted *infra*, this Court is not obligated to supply the basis for the Petitioner's relief. Without specific citation and argument, nothing more than speculation has been presented. Moreover, the North Carolina Supreme Court made it clear that "[w]ith regard to the remainder of defendant's arguments which focus on the appointment of interpreter Drain, defendant objected to the appointment on only one ground: that Drain was not qualified." **Id., at 407, 508 S.E.2d at 512.** As a result, the court refused to consider any other issues.

The other aspersion cast on appellate counsel involves the testimony of three prosecution witnesses concerning what Gabriel told them during the investigation. The North Carolina Supreme Court refused to consider this issue because appellate counsel failed to attach the relevant portions of the trial transcript. Petitioner claims this amounts to ineffective assistance. However, he does not state in what manner, other than a conclusory allegation, the preservation of this issue would have resulted in a new trial.[15] **McCarver v. Lee, 221 F.3d 583, 588 n.1 (4th Cir. 2000)**

---

[15] There are also some vague references to other examples of ineffectiveness, such as the failure to preserve issues concerning evidence at the crime scene and autopsy. However, no explanation is provided as to

**(declining to consider issues on habeas review in a capital case that were not briefed).** "[A] habeas petitioner must come forward with some evidence that the claim might have merit. Unsupported, conclusory allegations do not entitle a habeas petitioner to [relief]." ***Nickerson v. Lee*, 971 F.2d 1125, 1136 (4th Cir. 1992),** *cert. denied*, **507 U.S. 923 (1993),** *abrogated on other grounds recognized, Yeatts v. Angelone*, **166 F.3d 255 (4th Cir. 1999).** The Petitioner bears the burden of affirmatively showing deficient performance. ***Spencer v. Murray*, 18 F.3d 229, 233 (4th Cir. 1994).** As a result, the performance of appellate counsel was not ineffective and the MAR court's ruling in this regard was in keeping with the standard set by § 2254.

Moving back to the performance of trial counsel, the Petitioner claims his attorneys were ineffective because they did not present a defense during trial and at re-sentencing of his "domination" by Varden. In other words, had such a defense been offered during trial, counsel could have requested an instruction during the penalty phase concerning the following mitigating circumstance: "The defendant was an accomplice in or

_____

the manner in which the preservation of those issues would have resulted in a new trial.

accessory to the capital felony committed by another person and his participation was relatively minor." **N.C. Gen. Stat. § 15A-2000(f)(4).** This argument is somewhat confusing since there is a specific mitigation factor for domination: "The defendant acted under duress or under the domination of another person." **N.C. Gen. Stat. § 15A-2000(f)(5).** And, the Petitioner argues that the evidence of Varden's being an accomplice would have led to this statutory mitigating factor.

The evidence which should have been presented, according to the Petitioner, was his wife's testimony during the guilt phase and the expert opinion of Dr. Claudia Coleman during the sentencing phase. What that testimony would have shown is based on an affidavit of the wife made in support of this motion and the report of Dr. Coleman, also prepared in connection with this petition.

In support of this motion, the Petitioner has provided an affidavit in which he swears that during "the course of their representation I consistently told both Mr. Lynch and Mr. Wiley *that I was not the person who struck and killed Macedonio Hernandez.*" **Appendix I, Affidavit of Eric Lawrence Call,** *attached to* **Petition, ¶ 3 (emphasis added).** Likewise, Mr. Lynch averred that "Eric Call always denied to me that he

had murdered Macedonio Hernandez." **Lynch Affidavit, ¶ 11.** And, co-counsel, Don Wiley, also averred that "Eric Call always denied to me, and to Tony Lynch when we were together, that he had committed the crime." **Wiley Affidavit, ¶ 17.** The North Carolina Supreme Court has "specifically held that the attorney's concession of guilt without the consent of his client amount[s] to *per se* ineffective assistance." ***State v. Campbell*, 359 N.C. 644, 695, 617 S.E.2d 1, 33 (2005) (citing *State v. Harbison*, 315 N.C. 175, 180, 337 S.E.2d 504, 507-08 (1985)).** The Petitioner's trial counsel could not have argued for the submission of either of these mitigating factors without also admitting the Petitioner's guilt without his permission, something which would have been *per se* ineffective assistance. *Id.* And, it is worth noting that even in connection with this motion, the Petitioner continues to admit that he maintained his innocence to his trial counsel. In what manner counsel could have presented the defense of acting under Varden's domination without admitting guilt has not been explained.

Moreover, in this motion, Petitioner notes "the State had strong evidence that Eric Call assaulted Gabriel Gonzalez [so] the jurors would more likely than not conclude that the same man committed both the Gonzalez assault and the Hernandez murder." **Petition, at 73.** Thus,

Petitioner admits that had trial counsel conceded his guilt as to the assault of Gabriel, the jury would have concluded that he also murdered the victim.

Yet, in the face of this admission and the Petitioner's proclamations of innocence, he claims that defense counsel should have presented a domination defense. ***State v. Walls*, 342 N.C. 1, 52, 463 S.E.2d 738, 765 (1995) ("Further, defendant's premise rides on the horns of a rather obvious dilemma when he contends on the one hand that he 'is not even guilty of murder' and thus there is no offense, and on the other hand that the testimony is relevant as to one of the 'circumstances of the offense.").** And, Petitioner has presented affidavits from the jurors to the effect that it would have made a difference had they known of Varden's involvement. **Appendix K, Affidavit of Eric Pate, *attached to* Petition, ¶¶ 4,5 ("I would have liked to hear from Eric Call's wife or more from other witnesses. At least that would have made a difference. Anything's better than nothing. The letter from Eric Call, the tracks at the murder scene and the photos made the difference in the decision."); Appendix O, Affidavit of Ann Mathews, *attached to* Petition, ¶ 5 ("It probably would have made a difference in my decision between life without parole and the death penalty if I had**

**known Varden had been involved.").**  Indeed, these affidavits may not be considered by this Court as they constitute testimony about the jury's deliberative processes.  ***State v. Bauberger*, ___ N.C. App. ___, 626 S.E.2d 700, 704-05 (2006) (citing *State v. Barnes*, 345 N.C. 184, 481 S.E.2d 44 (1997)); *Berrier v. Thrift*, 107 N.C. App. 356, 365, 420 S.E.2d 206, 211 (1992) (It is well settled "that intrajury influences on a verdict, also known as matters that inhere in the verdict, cannot be inquired into.").**  In fact, in North Carolina state courts,

> [u]pon an inquiry into the validity of a verdict[,] . . . a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict . . . or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

**N.C. Gen. Stat. § 8C-1, Rule 606(b).**  Thus, the MAR court which struck these affidavits was entirely correct in so doing.  ***Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006).**  Moreover, the conclusions of that court concerning the so-called "domination" defense were not contrary to or an unreasonable application of clearly established federal law.  **Vol. III,**

*attached to* Respondent's Answer, at Tab 15, pp. 9-10 ("Call attempted to put the blame on Alan Varden at trial and the jury rejected that theory. Call, not Varden, left town quickly, changed his appearance by shaving his beard, cutting his hair and changing the color of his hair, change the appearance of his truck by removing the camper shell and assumed a false identity. Call left a letter exonerating his wife. Call was identified by Gabriel . . . as the person who assaulted him and who took Macedonio with him to move furniture."); *id.*, at p. 12 ("Call's position at trial was that he 'did not do it.'"); *id.*, at pp. 15-16 ("Call denied his guilt completely at trial and therefore could not have argued that he acted under duress or domination of anyone. There is no evidence that Varden ever threatened Call. The opinion of a mental health expert that Call was subject to domination by others would not have supported submission of the mitigating circumstance of duress or domination because Call denied his guilt completely. The evidence of record does not support a conclusion that Varden murdered Macedonio. Call has not provided this Court with evidence to support that conclusion. The evidence does not support a conclusion that Call was merely an accomplice or that his

**participation was relatively minor.  Call denied any participation.  Trial counsel cannot be found ineffective based on a failure to request submission of mitigating circumstances that were unsupported by the evidence.  Trial counsel cannot be found ineffective based on a failure to abandon a total innocence defense in favor of arguing a lesser degree of culpability because Call maintained his innocence.”).**

**E.**     **Errors of the trial court.**

Having exhausted the attack on the performance of counsel, Petitioner next assigns errors to the trial court.  He claims it was error for the trial court to allow Gabriel to testify through an interpreter as to what he heard said between his uncle and the Petitioner.  The argument is that since Gabriel did not speak very much English, he could not testify as to what he heard the Petitioner say in English.  The North Carolina Supreme Court addressed this same argument and concluded that "Gabriel was competent to testify to his observations."  ***Call*, 349 N.C. at 407, 508 S.E.2d at 512.**  While Petitioner claims this ruling violated his "Fifth, Sixth and Fourteenth Amendments" rights, no further explanation is offered to support the argument.  Likewise, he claims error in the trial court's refusal

to allow cross-examination of Varden as to certain issues.  Again, while he claims that constitutional rights have been violated, Petitioner points to nothing more than disagreement with the evidentiary rulings of the trial court.

"In federal habeas actions, [the court does] not sit to review the admissibility of evidence under state law unless erroneous evidentiary rulings were so extreme as to result in a denial of a constitutionally fair proceeding."  **Burket v. Angelone, 208 F.3d 179, 186 (4th Cir. 2000); accord, Hawkins v. Costello, __ F.3d __, 2006 WL 2277967, **5 (2d Cir. 2006) ("Of course, 'habeas corpus relief does not lie for error of state law,' and that necessarily includes erroneous evidentiary rulings." (quoting Wade v. Mantello, 333 F.3d 51, 59 (2d Cir. 2003)); Broom v. Mitchell, 441 F.3d 392 (6th Cir. 2006); Kittelson v. Dretke, 426 F.3d 306 (5th Cir. 2005); Howard v. Moore, 131 F.3d 399, 415 n.18 (4th Cir. 1997) ("State court trial rulings regarding the admission and exclusion of evidence are cognizable in federal habeas corpus review only to the extent that they violate specific constitutional provisions or are so egregious as to render the entire trial fundamentally unfair, thereby violating the Due Process Clause[.]").**  Petitioner does not advise in

what manner his constitutional rights have been violated; he merely makes the blanket and unsupported allegation that those rights were violated. As previously noted, that is insufficient to invoke habeas review. "[M]ere conclusory allegations do not raise a constitutional issue in a habeas proceeding." ***Ross*, 694 F.2d at 1012.** "Even in a death penalty case, bald assertions and conclusory allegations do not provide sufficient ground to warrant" relief. ***Stanford*, 266 F.3d at 460 (quotation omitted).** "Such conclusory, speculative allegations do not preclude the district court's dismissal of [the Petitioner's] claim." ***Walton*, 440 F.3d at 178; *Rolan*, 445 F.3d 682; *Murphy*, 416 F.3d at 436-37; *Anderson*, 425 F.3d at 858-59 ("[T]he factual allegations must be specific and particularized, not general or conclusory,") (quotation omitted).** Thus, these claims are rejected.

Moreover, the MAR court did not violate the proscriptions of § 2254. **Vol. III, *attached to* Respondent's Answer, at Tab 15, p. 17 ("Trial counsel could not argue that Varden was an accomplice without admitting Call's participation."); *id.*, at p. 21 ("The State addressed the merits of Call's arguments regarding the introduction of hearsay and character evidence on direct appeal and showed them to be without**

merit."); *id.*, at pp. 28-29 ("A review of the record shows that by changing mental health experts, trial counsel were able to secure submission of the statutory mitigating circumstance that the Defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired on the date of the murder, as well as three additional non-statutory mitigating circumstances. . . . It is unlikely that the jury would have been positively influenced by efforts to refute the jury's guilty verdict by attempting to focus on Varden as the guilty party or to lay blame on Virginia Call."); *id.*, at pp. 29-30 ("Trial counsel were not in a position to present Call's explanation of the events of the night of the murder because Call chose not to testify. Call had not explained the events of the night of the murder at the time of his resentencing, nor has he explained them in his motion for appropriate relief."); *id.*, at p. 32 ("Call's guilt had already been determined by the jury and trial counsel could not be expected to try to convince the jury that the verdict was in error.").

The Petitioner also claims the trial court erred by allowing the prosecutor to make highly prejudicial remarks during closing arguments at

the guilt phase of the trial.  The Petitioner claims the prosecutor misstated the evidence, argued facts not in evidence, urged the jurors to apply erroneous legal principles, and improperly reenacted a portion of the crime during closing argument.  In support of this claim, Petitioner cites one case for the proposition that closing arguments may not contain counsel's personal opinion, refer to matters outside of the record, may not appeal to passion, and may argue only inferences which may be fairly construed from the evidence admitted at trial.  In closing, Petitioner states that "[p]rosecutorial argument which is not warranted by the law is a violation of a defendant's constitutional rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution."  **Petition, at 82.**

The North Carolina Supreme Court considered each issue raised by the Petitioner and decided against him as to each such issue.  ***Call*, 349 N.C. at 419-23, 508 S.E.2d 519-22.**  The MAR court also acknowledged the Supreme Court's ruling and noted that it had considered those claims "on the merits."  **Vol, III, *supra*, at Tab 15, p. 23.**  However, just as in this motion, the MAR court noted that counsel had failed "to show how a constitutional objection" would have resulted in a meritorious appeal.  ***Id.***

The conclusory allegation that the closing argument remarks violated "the Fifth, Eighth and Fourteenth Amendments" is insufficient to warrant extensive discussion here. A conclusory catch-all such as this is insufficient to warrant habeas review. ***Jones v. Gomez*, 66 F.3d 199, 204 (9th Cir. 1995).** "[M]ere conclusory allegations do not raise a constitutional issue in a habeas proceeding." ***Ross, supra*.** "Even in a death penalty case, bald assertions and conclusory allegations do not provide sufficient ground to warrant" relief. ***Stanford, supra* (quotation omitted).** "Such conclusory, speculative allegations do not preclude the district court's dismissal of [the Petitioner's] claim." ***Walton, supra***; ***Rolan, supra***; ***Murphy, supra***; ***Anderson, supra* ("[T]he factual allegations must be specific and particularized, not general or conclusory." (quotation omitted)).** Thus, these claims are rejected.

In his next assignment of error, the Petitioner claims that his trial attorneys moved for discovery but the State withheld four statements: three statements taken by the authorities from Varden and one statement taken from Jenny Call. According to the Petitioner, despite repeated requests from trial counsel, "Varden's statement was not turned over until he testified and the interview with Virginia Cox was never turned over to

trial attorneys." **Petition, at 83.** Petitioner does not blame the State court

for this delayed discovery, but instead claims that the prosecution

intentionally withheld the evidence.

On direct appeal, appellate counsel argued that "the trial court[16]

improperly allowed prosecutors to withhold pretrial statements made to law

enforcement officers by prosecution witnesses Alan Varden and Virginia

Call." ***Call*, 349 N.C. at 399, 508 S.E.2d at 507 (footnote added).**

> Defendant contends that the statements contain favorable
> evidence that the prosecution was obligated to turn over to the
> defense pursuant to *Brady*[.] In *Brady*, the United States
> Supreme Court held that the prosecution may not suppress
> favorable evidence which is material to the guilt or punishment
> of a defendant without violating due process. Evidence is
> considered material only if there is a "reasonable possibility" of
> a different result had the evidence been disclosed to the
> defense. After thoroughly reviewing the statements in the
> amended record, we do not believe that either statement was
> material within the Supreme Court's meaning under *Brady*. At
> most, Virginia Call's statement suggested that defendant did
> not have the courage to murder Macedonio. However, both
> statements still tended to establish defendant's guilt. Even
> assuming, *arguendo*, that the statements were discoverable,
> the prosecution satisfied the requirements under *Brady* by
> providing the defense with the statements at trial in time for
> defendant to make effective use of them. Virginia Call was not

---

[16] Thus, the argument below cast blame on the trial court; whereas here, Petitioner claims the prosecution withheld exculpatory evidence. It is therefore at least arguable that the claim has been defaulted. However, in the interest of finality, the Court will address the claim.

called as a witness, and Alan Varden was cross-examined about his statement. Thus, defendant cannot show that he was prejudiced.

*Id.*

As noted *infra*, on direct appeal, the Petitioner attacked the trial court's ruling. Now, he claims the prosecution withheld this evidence, thus violating his constitutional rights. However, the Petitioner's trial attorneys saw and reviewed these statements in January 1996[17] within the State's discovery file, a fact revealed in the text of the motion later made by counsel for copies of the statements. **Vol. I,** ***supra*****, at Tab 1, pp. 44-46 ("In January of 1996 Anthony Lynch, one of Defendant's attorneys, briefly saw multiple statements made by Alan Bertram Varden and Virginia Cox Call** *while reviewing the State's discovery in this case***[.] . . . The statements made by Alan Varden directly contradict the statements made by Virginia Call and vice versa. Also Alan Varden contradicts himself in his multiple statements.").**

Indeed, during oral argument of the motion, counsel acknowledged that "the district attorney maybe went maybe (sic) beyond what he needed

---

[17] Petitioner claims that one such statement from Varden was never disclosed. The record belies that claim; however, the rulings herein render that argument futile.

to do when he originally showed them to me[.]" **Trial Transcript, Vol. I, at 42.** In fact, the district attorney argued that "we never even had to let him see the statements." *Id.*, **at 43.** And, trial counsel once again acknowledged, "That's true. . . . I appreciate that they let me see them, because I wouldn't know about the contradictions, but now I do." *Id.* Trial counsel recalled quite vividly the details of these statements because during oral argument in support of the motion, counsel recounted the various inconsistencies among the statements. *Id.*, **at 39-45; 56-60,** *see also***, at 58 ("Ms. Cox states that my client had blood on him. Mr. Varden states that my client had no blood on him, and there is no serology test linking my client to any blood involved in this case.").** Despite counsel's argument that the *state* improperly withheld this evidence, the trial court ruled that the statements did not qualify as *Brady* material and that ruling was upheld by the North Carolina Supreme Court. Moreover, the trial court ordered the statements disclosed to the defense prior to Varden's testimony. **Trial Transcript, Vol. II, at 158 ("Mr. Lynch: I'd renew my motion on the statements of Varden and Jennie Call, Your Honor, at this time. . . . You've seen enough and know enough about this case now to know that their statements may be**

**exculpatory, and that there are some contradictions on the statements of the witnesses that they've already presented, and that it becomes more exculpatory as time goes on. The Court: Well, I've looked at them, and I'll let you have them when they testify.").** Since Virginia Call did not testify, her statement was not ordered to be turned over to the defense.

Petitioner does not argue that the State court was in error, only that the prosecution illegally withheld these statements. However, the record reveals both that the prosecutor did allow review of the statements and that the State trial court found they were not *Brady* material in any event. In what manner this constitutes a decision contrary to clearly established federal law is not presented in the habeas petition.

On direct appeal from the Petitioner's second sentencing hearing, appellate counsel claimed that the trial court erred "by failing to intervene *ex mero motu* to prevent improper argument by the prosecutor during closing arguments." ***Call*, 353 N.C. at 416, 545 S.E.2d at 201.** Now, in the habeas petition, he claims that the prosecutor engaged in improper

argument.  As previously noted, while an argument could be made that this

claim is procedurally defaulted, the undersigned will address the merits.[18]

The first assignment of error is an allegation that the prosecutor

threatened the jury with divine retribution if they did not return a verdict of a

sentence of death.  The actual closing argument contained the following:

> Don't forget your duty as a juror in this case.  Your duty is,
> ladies and  gentlemen of the jury, to set a punishment.  We're
> here to punish Mr.  Call for the crimes he's committed.  We're
> not here to reward anybody.  We're not here to avenge
> anybody's debt. . . .  [Y]our duty is to apply the facts that you
> heard in this case to the law that the Judge is going to give you.
> And, if the facts fit the law and show that you ought to
> recommend the death penalty, you cannot let your emotions
> override your duty. . . .  There's nothing easy in anybody's case
> when it comes down to the saying whether a man ought to live
> or die.  Nobody said it was easy.  But, you have to go by the
> law.  Not only that, *you gave your oath to this Court that you
> would hear this case fairly, impartially, you would follow the law
> even if you disregard it, and you would decide this case, this
> verdict without sympathy and without prejudice for anyone.
> And, if you didn't do that, and if you don't do that, there's
> nothing we can do about it.  But, one day you'll have to answer
> to somebody higher than this court.*

---

[18] A petitioner fairly presents the substance of his federal habeas
corpus claim when the state courts are afforded sufficient notice and a fair
opportunity to apply controlling legal principles to the facts bearing on the
constitutional claim.  ***Anderson v. Harless*, 459 U.S. 4, 6 (1982).**  In
determining whether the trial court committed error, the North Carolina
Supreme Court discussed and considered the conduct of the prosecutor.

**Transcript of Re-Sentencing Hearing, Vol. III, at 247-48 (emphasis added).**

In dealing with the closing argument issue, the North Carolina Supreme Court noted:

> This Court has disapproved "'arguments to the effect that the law enforcement powers of the State come from God and that to resist those powers is to resist God.'" We have also repeatedly cautioned counsel "'that they should base their jury arguments solely upon the secular law and the facts.'" As we have previously recognized, "[j]ury arguments based on any of the religions of the world inevitably pose a danger of distracting the jury from its sole and exclusive duty of applying secular law and unnecessarily risk reversal of otherwise error-free trials." In the instant case, the prosecutor did not contend that the State's law enforcement powers were ordained by God. We also note that, . . . the prosecutor in the present case told the jury that it should make its sentencing decision based on the law and the evidence presented in this case. Accordingly, the prosecutor's argument was not . . . grossly improper[.]

*Call*, 353 N.C. at 419, 545 S.E.2d at 202-03 (quoting *State v. Cummings*, 352 N.C. 600, 628, 536 S.E.2d 36, 56 (2000) (quoting *State v. Geddie*, 345 N.C. 73, 100, 478 S.E.2d 146, 160 (1996)) and *State v. Davis*, 353 N.C. 1, 28, 539 S.E.2d 243, 262 (2000) (quoting *State v. Williams*, 350 N.C. 1, 27, 510 S.E.2d 626, 643 (1999))) (other internal citations omitted).

Petitioner does not cite any federal law in support of his argument, with the exception of a state court case which quotes a Supreme Court case.  However, the prosecutor was not alone in his invocation of the deity during closing arguments.  Defense counsel made comparisons to Jesus in explaining the model for determining whether to put someone to death and picked up the Bible in so doing.  **Re-Sentencing Transcript,** *supra***, at 293.**  He argued that looking to ancient literature would not provide the proper role model and again picked up the Bible while stating "those are the wrong places to look for the kind of inspiration for the kind of help in guiding where you go on this path that you're about to walk."  *Id.***, at 296.** "[A] greater mind set down exactly how to approach something like this.  I call heaven and earth . . . it's Deuteronomy 30:19.  "I call heaven and earth to record this day against you, that I have set before you life and death, blessing and cursing; therefore chose (sic) life, that both thou and thy seed may live."  *Id.*

If the prosecutor told the jury they have to answer to God by not sentencing the Petitioner to death, defense counsel told the jury they would indeed have to answer to God if they did sentence the Petitioner to death.

The issue is whether, under these circumstances, the two spiritual "threats"

neutralize the setting.

> [Petitioner] argues with regard to the prosecutor's religious
> reference during closing that this Court has designated religion
> as a subject inappropriate for closing arguments. Admittedly,
> some religious statements are discouraged in closing
> argument. In particular, we have "'distinguished as improper
> remarks that state law is divinely inspired . . . or that law
> officers are 'ordained' by God.'" The argument at issue here,
> however, . . . is not of the type which we have overturned on
> previous occasions. We hold that, rather than invoking
> religious law over secular law, this argument merely urges
> jurors to make the decision the State viewed as the proper one
> – recommending a death sentence. Moreover, even if it be
> assumed *arguendo* that this statement was improper, the
> prejudice, if any was neutralized by defense counsels' use of
> religious arguments during their closing, analogizing that jurors
> should be merciful as Jesus Christ was.

**State v. Roache**, 358 N.C. 243, 322 (2004) (quoting **State v. Braxton**,

352 N.C. 158, 217, 531 S.E.2d 428, 462 (2000) (quoting **State v. Artis**,

325 N.C. 278, 331, 384 S.E.2d 470, 500 (1989))). Indeed, it has recently

been noted by one North Carolina Supreme Court Justice that "[his]

research has failed to reveal *any* case where this Court reversed a

conviction because of an improper argument based upon religion." **State**

**v. Haselden**, 357 N.C. 1, 37-38, 577 S.E.2d 594, 616-17 (2003)

**(Edmunds, J. dissenting) (collecting cases and noting that "[a] review**

**of the reported cases demonstrates that many religious arguments**

**are made by a party to preempt religious arguments that may be made by opposing counsel in an unrebuttable closing argument. Consequently, these arguments feed on themselves as each side rolls out the ecclesiastical artillery.").** Such was the case here. Regardless of the reason, both sides told the jurors that their decision would be subject to review in a higher court. The undersigned cannot find any unreasonable application of clearly established federal law. To the contrary, each side relied on its own "ecclesiastical artillery." *Id.*

Next, the Petitioner claims that a portion of the prosecutor's closing argument led the jury to believe that four aggravating factors had already been determined at a preliminary hearing and thus, they were not to make findings in that regard. The portion of the closing argument quoted in Petitioner's brief is blatantly incomplete. The argument actually concluded with the observation that the verdict sheet would advise the jury that they would have to "unanimously find from the evidence beyond a reasonable doubt the existence of one or more of the following [four] aggravating circumstances[.]" **Re-sentencing Transcript, *supra*, at 249-50.** In addition, the re-sentencing court instructed the jury as to the law. Jurors are presumed to follow the law as so instructed. ***Richardson v. Marsh,***

**481 U.S. 200, 211 (1987);** *Underdahl v. Carlson*, **__ F.3d __, 2006 WL 2548414, \*4 (8th Cir. 2006) ("There is a presumption that jurors follow the court's instructions.");** *Bland v. Sirmons*, **459 F.3d 999, ___, 2006 WL 2171516, \*10 (10th Cir. 2006) ("The jury is presumed to follow its instructions, even when there has been misleading argument." (citing** *Weeks v. Angelone*, **528 U.S. 225, 234 (2000))).**  As aptly noted by the North Carolina Supreme Court, "[w]hen read in context, the prosecutor's argument informed the jurors that they would have to determine beyond a reasonable doubt whether any of the submitted aggravating circumstances existed."  *Call*, **353 N.C. at 424, 545 S.E.2d at 205.**  The undersigned, like the state court "fail[s] to see how the challenged argument could have left jurors with the impression that the four submitted aggravating circumstances had already been determined to exist."  *Id.*, **at 423-24, 545 S.E.2d at 205.**  "Juries are presumed to follow the court's instructions, and [the undersigned does] not believe that the Supreme Court of [North] Carolina's rejection of this claim was unreasonable."  *Young*, **205 F.3d at 764 (internal citations omitted).**

The next claim is that the jury instruction submitted to the jury during the penalty phase concerning the existence of the heinous, atrocious or

cruel aggravating factor is unconstitutionally vague. The Petitioner argues

that the additional narrowing definitions contained within that instruction

were insufficient to pass constitutional muster.

The jury was charged during the penalty phase as follows:

The State must prove from the evidence beyond a reasonable doubt the existence of any aggravating circumstance, and before you find any aggravating circumstance you must agree unanimously that it has been so proven. An aggravating circumstance is a fact or a group of facts which tend to make a specific murder particularly deserving of the maximum punishment prescribed by law. Our law identifies the aggravating circumstances which might justify a sentence of death. Only those aggravating circumstances identified by statute may be considered [by] you as aggravating circumstances.

. . .

Number 3. Was this murder especially heinous, atrocious or cruel.

In this context heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile. Cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering [of] others. *However, it is not enough that this murder be heinous, atrocious or cruel as those terms have just been defined, this murder must have been especially heinous, atrocious or cruel*, *and not ever[y] murder is especially so. For this murder to have been especially heinous, atrocious or cruel*, *any brutality which was involved in it must have exceeded that which is normally present in any killing, or this murder must have been a conscience[less] or pitiless crime which was unnecessarily torturous to the victim.*

**Re-Sentencing Transcript, Vol. III,** *supra***, at 313-14, 316 (emphasis**

**added).** In considering the identical jury instruction, the Fourth Circuit has

recently noted that the North Carolina Supreme Court has "further defined

the vague terms" and that "those definitions are constitutionally sufficient,"

that is, "they provide *some* guidance to the sentencer." ***Bates v. Lee***, **308**

**F.3d 411, 424 (4th Cir. 2002).** In *Bates*, the Fourth Circuit found that an

instruction using the same narrowing language[19] as that in the case at

hand passed constitutional muster. ***Id.*** Indeed, the Circuit noted that it

had "recently considered an Eighth Amendment challenge to precisely the

same aggravating circumstance instruction" and had "concluded that the

North Carolina Supreme Court's rejection of the challenge was neither

contrary to nor an unreasonable application of clearly established Supreme

Court precedent." ***Id.* (citing *Fullwood v. Lee*,** *supra***).**

Petitioner acknowledged in his petition the existence of precedent

contrary to his position, although the *Bates* decision was not cited.

However, Petitioner has done nothing more than state his disagreement

---

[19] The language is identical to the italicized portion of the instruction
quoted *infra*.

with the position of the Circuit.  This is insufficient, even in a capital case, to raise a viable claim.

The final argument raised by the Petitioner is that the above aggravating circumstance should not have been submitted to the jury due to insufficient evidence.[20]  Basically, the argument is that because there was no eyewitness to the murder, with the exception of the murderer,[21] the existence of facts sufficient to warrant the aggravating circumstance were not in evidence.  The Petitioner does acknowledge the following: (1) he intended to rob the victim, according to the testimony of Varden; (2) he lured the victim into his truck under the guise of earning some money; and (3) "someone" struck the victim "on the head multiple times, tied him up, took his money and left him in the cornfield."  **Petition, at 95.**  Despite these implicit admissions that the victim was robbed, lured into a position where he could be murdered, repeatedly hit in the head with a blunt object,

---

[20] "In determining whether the evidence is sufficient to support a finding of essential facts which would support a determination that a murder was "especially heinous, atrocious, or cruel" the evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom."  ***State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984).**

[21] Petitioner persists in the implication that Varden must have been the murderer.  It cannot be overlooked that Gabriel never once accused Varden of being involved in any manner.

bound up in "hog tied" fashion, and left for dead when he may have been alive, the Petitioner nonetheless argues there was insufficient evidence to show that the victim did not die instantly upon the infliction of the first blow to the head. Thus, he claims there was insufficient evidence to show that the victim suffered, was aware of his impending death, or helpless to prevent the same, and the aggravating circumstance was not warranted.

There are several points to be noted in this regard. The victim was an illegal alien whose English was at best minimal. Nonetheless, under the guise of earning a mere $25 and clearly appealing to the victim's work ethic, the Petitioner lured him to a remote location for the purpose of robbing him. **Fox v. Coyle, 271 F.3d 658, 668 (6th Cir. 2001) ("Fox purposely used deception to lure two young women into his control. . . . When [the victim] attempted to get away from Fox, he brutally stabbed and strangled her to death and left her body in a rural ditch.").** It is impossible to tell whether the victim was beat repeatedly over the head first or tied up first. Either scenario does the Petitioner no good. **Artis, 325 N.C. at 317, 384 S.E.2d at 492 (Defendant "hypothesizes that the victim lost consciousness sometime before her death and therefore would not have felt 'whatever pain might have**

**been caused by continued choking.' Defendant clearly**

**misapprehends the applicable standard.").** If the victim were first tied

up, it would have been clear to him that he was about to be hurt and he

was entirely helpless to defend himself due to the manner in which he was

bound. If the victim were repeatedly hit first, the fact that the Petitioner

then felt it necessary to tie him up meant that he thought the victim might

escape, proving that the victim not only suffered but was unable to help

himself and could have died a slow death. ***Romano v. Gibson*, 239 F.3d**

**1156, 1176-77 (10th Cir. 2001) ("The fact that Sarfaty's killers bound his**

**arms and legs is evidence in this case that he was conscious during**

**at least part of the attack; there would be no need to bind a dead**

**person, although there could be a motive to bind an unconscious**

**person to guard against the possibility that the person would regain**

**consciousness.").** The Petitioner thought the victim might have still been

alive hours later because he told Varden that he should go back to check

his pulse.

The North Carolina Supreme Court held:

[T]he State's evidence tended to show that defendant lured the
victim to a rural location where he knew they would be alone.
Without provocation, defendant then beat the victim to death

with a shovel handle and a tire iron, supporting an inference that the murder was conscienceless and pitiless. Defendant inflicted several blunt-force injuries to the victim's head, causing the victim's skin to split and leaving jagged fractures of bone underneath the victim's forehead, beneath his left eye, and across the bridge of his nose. Defendant also caused the skin to split and the bone to fracture above the victim's ear. The force of the blows inflicted upon the victim by the defendant caused the shovel handle to break in half. The record also reveals that the defendant tied the victim's hands behind his back and tied his right foot up to his shoulder area. This evidence supports an inference that the victim was left in his last moments aware of but helpless to prevent impending death. This inference is buttressed by evidence that, upon returning to his residence, defendant told Varden he needed to return to the cornfield to see if the victim was alive because he had not checked his pulse. Defendant's statement to Varden indicates defendant's personal belief that the victim might have lived through the severe beating as he lay tied up on the ground. Viewed in the light most favorable to the State, the evidence in this case supports the trial court's submission of the (e)(9) aggravating circumstance that the murder was especially heinous, atrocious, or cruel.

*Call*, 353 N.C. at 425-26, 545 S.E.2d at 206 (quotation omitted).

The United States Supreme Court has recently upheld a state court's submission of the "heinous, atrocious or cruel" aggravating circumstance to the jury in a capital case involving the murder of vulnerable, elderly victims. *Bell v. Cone*, 543 U.S. 447 (2005). An illegal alien who did not speak English was also vulnerable, as would be an elderly victim. Likewise, an attempt to resist showed that their deaths were not instantaneous. *Id.*, at

**456.**  Here, the sheer quantity of blows to the victim's head would indicate that evidence of the aggravator was "overwhelming."  ***Id.*, at 457 ("[E]vidence of the aggravator is 'overwhelming' where an elderly murder victim was beaten to death with a blunt object and his hands showed that he had attempted to defend himself." (citation omitted)).** The Court also pointed out in that case that the victims had been "'brutally beaten to death by multiple crushing blows to the skulls'" and the "victims were helpless."  ***Id.***  Although the autopsy did not specifically state that the victim here had tried to avert the blows, that may have been because he had previously been bound and thus, in his "last moments aware of but helpless to prevent impending death."  ***State v. Hamlet*, 312 N.C. 162, 175, 321 S.E.2d 837, 846 (1984); *accord, State v. Stanley*, 310 N.C. 332, 338, 312 S.E.2d 393, 397 (1984) (defining the factor as the victim having been left "in his last moments as a sentient being, aware but helpless to prevent impending death[.]").**  In any event, the facts here also involve a vulnerable victim who suffered repeated blows to the head.

In *Simpson v. Polk*, 129 F. App'x 782 (4th Cir.), *cert. denied*, 126 S. Ct. 658 (2005), the Fourth Circuit denied habeas relief in a case in which the jury found the heinous aggravating factor was supported by the

evidence.  In that case, the victim was found lying across his bed with a strap tying his neck to the bedpost.  ***Id., at 784.***  The victim had "sustained blunt-trauma injuries to his face[.] . . .  The bone between the eye socket and the brain was fractured, the check and the jaw bone were broken." ***Id., at 785; accord, White v. Lee*, 238 F.3d 418 (table), 2000 WL 1803290 (4th Cir. 2000) (victim's hands tied behind her back, stabbed and beaten over the head with a blunt object; heinous aggravating circumstance submitted and upheld on habeas review.); *State v. Huffstetler*, 312 N.C. 92, 115-16, 322 S.E.2d 110, 125 (1984) (Victim was "battered to death by what can only have been a prolonged series of blows, blows with a cast-iron skillet so severe as to fracture her skull, neck, jaws and collarbone[.]").**   Likewise, in this case the coroner reported in graphic detail the severe blunt trauma injuries to the victim's head and face.  ***State v. Ingle*, 336 N.C. 617, 641-42, 445 S.E.2d 880, 893 (1994) ("When a murderer attacks an elderly victim by surprise and beats his brains out of his head by repeated blows of an axe handle without the slightest sign of provocation, it may be said that there is an inference that the murder was conscienceless and pitiless.").**

Moreover, as noted *infra*, the Petitioner lured the victim into a setting where he would be alone with the Petitioner. **State v. Lloyd, 321 N.C. 301, 319-20, 364 S.E.2d 316, 328 (1988).** The fact that the Petitioner went back for Gabriel also supports the heinous aggravating factor. Just as the Petitioner knew that Gabriel could identify him, he knew that the victim would have been able to identify him. **Bates v. Lee, 308 F.3d 411, 419-20 (4th Cir. 2002) ("After the murder, Bates told Grimes that he killed Jenkins because Bates couldn't let Jenkins live after Bates tortured him[.]").**

The decision of the North Carolina Supreme Court was not an unreasonable determination of the facts in light of the evidence presented at trial. Nor was it a decision contrary to or an unreasonable application of federal law.


**F.    The remaining motions.**

The Petitioner has also moved to hold this case in abeyance pending a declaration by the Supreme Court that *Crawford* is retroactive. The cases cited *infra* show that the issue of retroactivity is settled and the motion is, therefore, moot.

The Petitioner also moved to stay the conclusion of this proceeding pending the Supreme Court's decision in *Oregon v. Guzek*, 544 U.S. 998 (2005), granting *certiorari*. According to the Petitioner, the question presented in that case was whether a capital defendant has a constitutional right to offer evidence and argument in support of a residual doubt claim during the penalty phase of the trial. The decision of this issue would impact his case because he had argued in the MAR's that his attorneys should have objected to the introduction into evidence of Varden's statements to authorities during the penalty phase of his trial. The MAR court, he claims, found that it was of no moment because having been found guilty, the Petitioner could not then argue at sentencing that Varden was the actual murderer. The argument is that "defense counsel's choice not to raise Eric Call's lesser participation in the crime compared to Alan Varden in the guilt phase would not have prevented Eric Call from raising the argument in the sentencing phase." **Petitioner's Motion to Hold in Abeyance, filed June 23, 2005, at 4.**

On February 22, 2006, the United States Supreme Court decided *Oregon v. Guzek*.

> In any event, . . . *Franklin v. Lynaugh*, 487 U.S. 164 [ ] (1988) .
> . . makes clear . . . that this Court's previous cases had *not*

interpreted the Eighth Amendment as providing a capital
defendant the right to introduce at sentencing evidence
designed to cast "residual doubt" on his guilt of the basic crime
of conviction.

. . .

First, sentencing traditionally concerns *how*, not *whether*, a
defendant committed the crime.  But the evidence at issue here
– alibi evidence – concerns only *whether*, not *how*, he did so.
[T]he parties previously litigated the issue to which the
evidence is relevant – whether the defendant committed the
basic crime.  The evidence thereby attacks a previously
determined matter in a proceeding at which, in principle, that
matter is not at issue.  The law typically discourages collateral
attacks of this kind.

***Oregon*, 126 S. Ct. 1226, 1231-32 (2006).**  Inasmuch as the Supreme

Court has rejected the issue argued by the Petitioner, there is no need to

stay this case.

The Petitioner's last two motions are for an evidentiary hearing and

leave to conduct depositions.  Habeas counsel seek to depose Lt. James

Absner and Peyton Colvard of the Ashe County Sheriff's Department

because they were involved in the investigation of the murder.  "Common

sense would lead one to believe a deal was made for Varden's testimony

against Call and that these law enforcement officers would know about the

decisions."  **Petitioner's Request for Leave to Conduct Depositions,**

**filed June 13, 2005, at 2.**  And, Petitioner claims that the former

prosecutors could explain why they chose not to prosecute Varden or call

him as a witness as the second sentencing hearing. Moreover, the

Petitioner argues that SBI Agent Cabe (erroneously referred to as an FBI

agent in the motion) could also testify concerning why investigation of

Varden did not occur. However, the discussion contained herein renders

any such depositions moot since the Court has determined that the rulings

of the State courts that there was no immunity agreement with Varden are

not contrary to federal law or an unreasonable determination of facts.

Likewise, the ruling *infra* concerning Varden's presence at the second

sentencing hearing renders this request moot.

Finally, the Petitioner claims he is entitled to an evidentiary hearing,

primarily because he was denied a hearing by the State MAR courts.

> Where the facts are in dispute, the federal court in habeas
> corpus must hold an evidentiary hearing if the habeas applicant
> did not receive a full and fair evidentiary hearing in a state
> court, either at the time of the trial or in a collateral proceeding.
> . . .
> [A] federal court must grant an evidentiary hearing to a habeas
> applicant under the following circumstances: If (1) the merits of
> the factual dispute were not resolved in the state hearing; (2)
> the state factual determination is not fairly support by the
> record as a whole; (3) the fact-finding procedure employed by
> the state court was not adequate to afford a full and fair
> hearing; (4) there is a substantial allegation of newly
> discovered evidence; (5) the material facts were not adequately
> developed at the state-court hearing; or (6) for any reason it
> appears that the state trier of fact did not afford the habeas
> applicant a full and fair fact hearing.

***Townsend v. Sain***, **372 U.S. 293, 312-13 (1963);** ***accord, Bell v. Evatt***,

**72 F.3d 421, 427 n.5 (4th Cir. 1995).**  The Court does not find that any of

the six factors listed requires an evidentiary hearing in this case.

> An evidentiary hearing is not a fishing expedition for facts as
> yet unsuspected, but is instead "an instrument to test the truth
> of facts *already alleged* in the habeas petition."  Where, as
> here, a petitioner has not "allege[d] additional facts that, if true,
> would entitle him to relief," a hearing is unwarranted.

***Lenz***, **444 F.3d at 304 (quoting** ***Jones v. Polk***, **401 F.3d 257, 269 (4th Cir.**

**2005) and** ***McCarver v. Lee***, **221 F.3d 583, 598 (4th Cir. 2000)).**

Although the Petitioner has presented voluminous argument,

speculation and conclusory allegations, he has not shown an issue which,

if true, would have entitled him to relief under the habeas standard.

***Jones, supra***, **at 269 n.6 ("[T]o obtain an evidentiary hearing, the**

**petitioner must rely on more than merely plausible inferences that**

**there is a factual basis for his claim for relief.").**  Indeed, this lengthy

opinion explains in detail why the Petitioner's arguments, both legal and

factual, do not warrant relief.  ***Hill v. Ozmint***, **339 F.3d 187, 201 (4th Cir.**

**2003) ("In order to secure an evidentiary hearing, Hill was obliged to**

**allege 'facts that, if true,** ***would*** **entitle him to relief.'" (quoting**

***McCarver, supra*)).** "In short, [the Petitioner] has not pointed to any evidence that, if believed, would entitle him to relief." ***Id.***

## V. ORDER

**IT IS, THEREFORE, ORDERED** that the Petitioner's motions to conduct depositions and for an evidentiary hearing are hereby **DENIED**; and

**IT IS FURTHER ORDERED** that the Petitioner's motions to hold in abeyance are hereby **DENIED**; and

**IT IS FURTHER ORDERED** that the Respondent's motion for summary judgment is **ALLOWED**, and the Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is hereby **DENIED**.

A Judgment is filed herewith.

Signed: September 22, 2006

Lacy H. Thornburg
United States District Judge